# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
TODD DANNHAUSER, and                        :
TD CO., L.P.,                               :
                                            :   CIV. NO. 16-CV-00747 (CM)
                         Plaintiffs,        :
                                            :
vs.                                         :
                                            :
TSG REPORTING, INC.,                        :
                                            :
                         Defendant.         :
-----------------------------------------------------------------x
```

## AMENDED COMPLAINT

Plaintiffs Todd Dannhauser and TD Co., L.P. (together, "Dannhauser") file this Amended Complaint against defendant TSG Reporting, Inc. ("TSG"), upon personal knowledge as to their own actions and upon information and belief as to all matters, as follows:

### I.

### PRELIMINARY STATEMENT

Until he was wrongfully terminated in October 2015, Dannhauser was a valuable sales agent for TSG for more than ten years, and was TSG's leading sales agent for more than the last seven years. Indeed, TSG's business blossomed, and Dannhauser was paid bi-monthly commissions. In addition, Dannhauser received 8,000 shares of Class A voting stock, plus additional stock options. Moreover, beginning in September 2014, Dannhauser's commission structure included not only a percentage of revenues generated from clients he referred to TSG, but also a percentage of revenues generated by all other TSG sales agents.

Unfortunately, in November 2015, TSG wrongfully terminated Dannhauser. Apparently, TSG had, for some time, been surreptitiously seeking to disassociate itself from Dannhauser.

In conjunction with his wrongful termination, TSG informed Dannhauser of its intent to enforce his covenants of nondisclosure, noncompetition, and noninterference. Thereafter, TSG confirmed that Dannhauser's termination was for "cause" so as to preclude him from exercising lucrative stock options. It also became clear that TSG was not properly calculating Dannhauser's commissions.

In December 2015, Dannhauser undertook a preliminary audit of TSG's books and records. That audit revealed that TSG has been erroneously calculating Dannhauser's commissions since at least February 2012. In January 2016, Dannhauser provided timely notice to TSG of his election to exercise his stock options and to pay for those options with TSG common stock. TSG, however, has refused to recognize the exercise of those stock options as valid and to provide a fair market valuation of its stock to effectuate Dannhauser's acquisition of those shares.

Accordingly, Dannhauser brings this action to recover the commissions that should have been paid to him. Dannhauser also seeks a judicial declaration that: (i) TSG has wrongfully refused to recognize Dannhauser's exercise of his stock options; and (ii) TSG's interpretation of Dannhauser's covenants of noncompetition, nondisclosure, and noninterference is unreasonable and unenforceable.

## II.

## THE PARTIES

**A.   Plaintiffs**

1. Plaintiff Todd Dannhauser is a resident of the State of Texas.

2. Plaintiff TD Co., L.P. is a Delaware limited partnership with its principal place of business located in the State of Texas. TD Co., L.P. is erroneously identified as TD. & Co., LP in various agreements between the parties.

**B.   Defendant**

3.   Defendant TSG Reporting, Inc. is a New York corporation with its principal place of business located at 747 Third Avenue, New York, NY 10017. TSG may be served with process through its registered agent and outside counsel, Zukerman Gore Brandeis & Crossman, LLP, Attn: Joseph E. Maloney, Eleven Times Square, 15th Floor, New York, NY 10036.

## III.

### JURISDICTION AND VENUE

4.   This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because compete diversity exists between the parties and the amount in controversy exceeds $75,000.

5.   This Court has personal jurisdiction over TSG because it is engaged in a continuous and systematic course of business within the State of New York.

6.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because TSG is a resident of the judicial district, a substantial part of the events giving rise to this action occurred in this judicial district, and a contract between the parties mandates venue in New York City.

## IV.

### FACTUAL BACKGROUND

**A.   TSG Thrives Because Of Dannhauser.**

7.   TSG provides court reporting and video services nationally and internationally. In addition to its corporate headquarters in New York City, TSG has office locations in Atlanta, Boston, Chicago, Dallas, Farmingdale, Houston, Los Angeles, San Diego, San Francisco, Seattle, and Washington, D.C. TSG's success is due in large part to the energy, enthusiasm, and entrepreneurship of Dannhauser.

8.   Beginning in January 2005, TSG retained Dannhauser to sell its court reporting and video services to potential clients pursuant to a "Marketing Agreement." TSG agreed to pay

3

Dannhauser for his services by paying him commissions calculated on a graduating scale based on revenue benchmarks.

9. Dannhauser quickly achieved the highest revenue benchmark in the Marketing Agreement as TSG's revenues soared. As a result, in August 2008, TSG provided Dannhauser with 2,500 stock options that vested in accordance with a schedule based on the gross revenues realized by TSG from clients generated by Dannhauser (the "First Stock Option Agreement"). At that time, TSG acknowledged that 250 of those stock options vested based on the gross revenues that TSG already realized from Dannhauser's clients.

10. Then, in November 2010, TSG agreed not only to provide Dannhauser with 8,000 Class A shares of voting stock, but also agreed to pay the cost for that stock. TSG also separately acknowledged that all 2,500 stock options it previously granted to Dannhauser in the First Stock Option Agreement had already vested.

11. In February 2012, TSG agreed to amend the Marketing Agreement to increase Dannhauser's highest commission rate by five percent, and in September 2012, TSG granted Dannhauser additional stock options for 1,000 shares of Class A voting stock and 4,000 shares of Class B voting stock (the "Second Stock Option Agreements").

**B.   TSG Wrongfully Terminates Its Relationship With Dannhauser.**

12. Notwithstanding the success that TSG realized as a result of Dannhauser's efforts, TSG wrongfully terminated the Marketing Agreement by letter dated October 5, 2015. Dannhauser was informed that his termination was purportedly "due to Gross Reckless Misconduct and violation of company policy based on findings of the full investigation in which [Dannhauser] participated in regarding the Workplace Violence incident which occurred on September 24, 2015 involving [Dannhauser] and Nick Garcia."

13.     Pursuant to Section 4(b) of the Marketing Agreement, as amended, either TSG or Dannhauser could terminate the Agreement upon one month's written notice. In that event, Dannhauser would be entitled to continue to receive commissions for a period of two years after the date of termination. Section 4(b) did not require "cause" to terminate the Agreement.

14.     However, the First and Second Stock Option Agreements distinguish between a termination with and without "cause." Those Agreements define termination for "cause" as:

> (i) a breach of Section 6(a) of the Marketing Agreement . . ., (ii) [Dannhauser's] commission of an act involving fraud, embezzlement, or theft against [TSG], (iii) [Dannhauser's] engagement in gross reckless conduct that [TSG] in good faith reasonably determines will have a material adverse affect on the reputation, business, assets, properties, results of operations or financial condition of [TSG], (iv) [Dannhauser] shall be convicted of a felony or shall plead nolo contendere in respect thereof and (v) [Dannhauser's] breach of Section 16 or Section 18 of this Agreement.

15.     Section 6(a) of the Marketing Agreement precludes Dannhauser from referring any potential clients of TSG to another provider of court reporting and video services, unless any such potential clients advised that they were dissatisfied with TSG's court reporting and video services.

16.     Sections 16 and 18 of the First and Second Stock Option Agreements contain covenants of nondisclosure, noncompetition, and noninterference. Specifically, Section 16 precludes Dannhauser during the parties' relationship and for a period of two years thereafter from disclosing "any customer lists, trade secrets, or any secret or confidential information of any kind used by" TSG of which Dannhauser obtained knowledge based on his relationship with TSG. Section 18 precludes Dannhauser during the parties' relationship and for a period of two years thereafter from directly or indirectly competing against TSG without the prior consent of TSG. Section 18 also precludes Dannhauser during the parties' relationship and for a period of one year thereafter from directly or indirectly interfering with TSG's relationships with any clients,

employees, or independent contractors that had a relationship with TSG during Dannhauser's employment without its prior consent.

17. TSG's termination of Dannhauser was not for "cause" within the meaning of the First and Second Stock Option Agreements. TSG cannot show that "cause" existed for Dannhauser's termination based on: (i) a breach of Section 6(a) of the Marketing Agreement; (ii) the commission of an act involving fraud, embezzlement, or theft; (iii) a felony conviction or nolo contendere plea; or (iv) a breach of Section 16 or Section 18 of the First and Second Stock Option Agreements.

18. Dannhauser did not engage in gross reckless conduct that TSG could, in good faith, reasonably determine would have a material adverse affect on its reputation, business, assets, properties, results of operations or financial condition. The incident which purportedly provided the basis for Dannhauser's termination involved a private dispute between cousins that occurred at a residence and not at a TSG office or workplace. The termination occurred after other attempts by TSG to induce Dannhauser's departure, including not inviting Dannhauser to a TSG's sales retreat and attempting to discontinue Dannhauser's American Express Black Card.

19. TSG's termination of its relationship with Dannhauser was wrongful and not for "cause" within the meaning of the First and Second Stock Option Agreements. In particular, Dannhauser's termination was not based on a good faith belief that the underlying incident would materially adversely affect TSG's reputation, business, assets, properties, results of operations or financial condition.

### C. TSG Improperly Denies Dannhauser's Exercise Of Stock Options That Vested Under The First And Second Stock Option Agreements.

20. On January 2, 2016, in accordance with the First and Second Stock Option Agreements, Dannhauser provided written notice to TSG of his decision to exercise any and all

stock options that were granted to him and had vested prior to October 5, 2015. Pursuant to Section 4(b) of those Agreements, Dannhauser also informed TSG of his election to pay for those stock options with shares of TSG common stock and requested that TSG's Board of Directors provide him with a good faith determination of the fair market value of those shares to effectuate his acquisition of those shares.

21.    On January 8, 2016, TSG acknowledged that Dannhauser "provided notice prior to the expiration of the 90-day period that would apply if the options did not otherwise terminate upon his dismissal." However, that letter also stated TSG would refuse to provide a good faith determination of the fair market value of its common stock because it disputes Dannhauser's right to exercise those stock options based on its view that Dannhauser's termination was for "cause" and, therefore, his options also terminated upon his dismissal. That letter concluded: "should it be determined that Mr. Dannhauser was not terminated for cause, TSG would then provide a fair market value of the shares as of the date of exercise."

### D.    TSG Withholds Commissions Due And Owing To Dannhauser Under The Marketing Agreement.

22.    Pursuant to the terms of the Marketing Agreement, Dannhauser is entitled to the bi-monthly payment of commissions that are calculated based on percentages of "RARE," or "revenue after reporter expense." Those percentages graduate in accordance with escalating revenue benchmarks and remained in place until February 2012, when TSG raised the highest percentage of RARE on which Dannhauser's commissions were based by five percent. Prior to February 2012, Dannhauser surpassed the top revenue benchmark and, thereby, earned the highest commission percentage on all RARE he generated.

23.    Effective September 1, 2014, TSG and Dannhauser agreed to modify his commission structure by reducing the commission percentage applicable to the RARE he

generated by five percent in exchange for receiving a percentage of TSG's total gross profits after RARE, less shipping charges, an incentive bonus based on various quarterly growth comparisons, and reimbursement of all his meals.

24. On October 30, 2015, after TSG terminated the Marketing Agreement, Dannhauser wrote to TSG to express his concerns that he had not been paid all the commissions to which he was entitled and that "his future commissions may not properly include or account for all the clients he has referred to TSG." Given those concerns, Dannhauser requested that TSG implement a procedure to ensure that he "will receive a proper accounting for all the future commissions to which he is entitled."

25. On November 11, 2015, TSG informed Dannhauser in writing that it has purportedly paid him "all payments due and payable . . . in accordance with its normal payment practices." TSG continued:

> the Marketing Agreement provides certain limitations as to what constitutes a "Client" for purposes of calculating [Dannhauser's] commissions. Specifically, pursuant to Section 1(a) of the agreement, the definition of "Client" excludes "a law firm, corporation or other entity . . . to the extent any individual associated with such Client was a customer or was a Potential Customer of TSG before the Engaging Person first engaged the Services and such a customer continues to engage the Services after such Client becomes a Client." Thus, the mere fact that Mr. Dannhauser made a referral to TSG does not necessarily mean that [he] is entitled to commissions for *all* of the Services provided to that client by TSG.

(Emphasis in original.)

26. Section 3(a)(iv) of the Marketing Agreement provides that Dannhauser "shall have complete access to TSG's books, records and personnel at all reasonable times . . . in order to audit the accuracy of TSG's determination of Commissions." That provision further provides that in the event an audit confirms an underpayment of commissions to Dannhauser, TSG will pay the difference to Dannhauser, as well as reimburse him for the expenses he incurred in

8

connection with the audit "[i]f the audit should reveal any underpayment of Commissions by more than five percent (5%)."

27. On December 8, 2015, Dannhauser undertook a preliminary audit of the commissions that TSG has paid to him since February 2012. At the audit, TSG's Chief Executive Officer was present and advised that no documents particular to the calculation of Dannhauser's commissions existed. Rather, he stated that each and every use of TSG's court reporting and video services results in the payment of a commission, and the information underlying the calculation of all commissions payable by TSG was contained in purportedly proprietary databases and spreadsheets that he could, and did, manipulate to derive commissions data.

28. The audit undertaken by Dannhauser was incomplete. Nevertheless, it revealed that TSG has employed an *ad hoc* method of calculating commissions for Dannhauser that is contrary to the terms of the Marketing Agreement, as amended, in an effort to withhold and convert money owed to him.

29. In particular, TSG has not adhered to the definition of "Client" in the Marketing Agreement. Instead, TSG determines to whom commissions are payable and the applicable commission percentages based on the law firm that schedules the first deposition in a lawsuit. The sales agent(s) responsible for referring that law firm to TSG receive(s) their applicable commission percentage(s) for any other depositions scheduled by that law firm in that lawsuit.

30. In addition, if opposing counsel thereafter uses TSG's court reporting and video services for depositions they schedule in that same lawsuit, further commissions are paid by TSG, as follows: (i) the sales agent(s) entitled to a commission based on the law firm that scheduled the first deposition in the lawsuit receive(s) an additional 75% of their applicable

9

commission percentage(s) for the depositions scheduled by opposing counsel; and (ii) the sales agent(s) entitled to a commission based on their referral of that opposing counsel to TSG also receive(s) 50% of their applicable commission percentage(s) for the depositions scheduled by opposing counsel.

31.  TSG, therefore, pays a "split" commission in every lawsuit in which more than one TSG sales agent is responsible for TSG's relationship with the law firms involved in that lawsuit. In fact, it is common for TSG to pay split commissions.

32.  TSG's method of calculating commissions improperly diminishes the commissions payable to Dannhauser, in at least two ways.

33.  First, by calculating commissions based on the law firms that schedule depositions with TSG, TSG erroneously disregards the existence and import of relationships between TSG's sales agents and the corporate clients that retain the law firms that schedule those depositions. Indeed, Dannhauser has numerous relationships with corporate "Clients" (within the meaning of the Marketing Agreement) that direct their law firms to use TSG's court reporting and video services. Pursuant to the Marketing Agreement, Dannhauser is entitled to payment of single commissions for those depositions. However, TSG's focus on the law firms that schedule the depositions with TSG has resulted in Dannhauser not receiving single commissions in those instances. Instead, TSG has paid split commissions to Dannhauser when he and other TSG sales agents have a relationship with the particular law firms.

34.  Second, TSG lacks a process for accurately identifying to whom a split commission is owed. Thus, TSG fails to pay commissions to Dannhauser when his relationship with the particular law firm was not properly identified, or erroneously calculates the applicable split commission percentage payable to him when it has.

35. As a result, Dannhauser has not received commissions that should have been paid to him. Importantly, Dannhauser also will not receive future commissions to which he is entitled.

### E. TSG Improperly Seeks To Enforce Dannhauser's Noncompetition Agreement.

36. On October 5, 2015, TSG not only terminated the Marketing Agreement, but also specifically informed Dannhauser that it "intends to enforce its rights, to the fullest extent, under each of" (i) Section 6(a) of the Marketing Agreement, (ii) Dannhauser's Noncompetition Agreement, and (iii) Sections 16 and 18 of the First and Second Stock Option Agreements.

37. The Noncompetition Agreement contains the same covenants of nondisclosure, noncompetition, and noninterference as are set forth in Sections 16 and 18 of the First and Second Stock Option Agreements.

38. The Noncompetition Agreement also provides that, "If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled."

39. On October 30, 2015, Dannhauser wrote to TSG and requested that "TSG confirm that it will not seek to enforce Mr. Dannhauser's nondisclosure and noninterference agreements in the event that he were to accept a potential marketing opportunity at . . . an ediscovery or translation services firm" which provides "services that are wholly unrelated to the court reporting services offered by TSG."

40. On November 11, 2015, TSG responded to that request by Dannhauser by reiterating that TSG "intends to fully enforce Mr. Dannhauser's noncompetition, nondisclosure and noninterference agreements with TSG," stating that those covenants "[p]lainly . . . do not extend to employment with entities that do not compete with TSG," and asking for additional

11

information to determine whether Dannhauser would be in breach of his Noncompetition Agreement by accepting employment with an ediscovery or translation services firm. TSG stated that such additional information should include "the scope of Mr. Dannhauser's duties" with any such firm. Of course, Dannhauser's "duties" in any subsequent position of employment are irrelevant to whether Dannhauser will breach the noncompetition, nondisclosure, and noninterference covenants in the Noncompetition Agreement.

### F. The Damage Done

41. Dannhauser has been harmed by TSG's improper refusal to recognize the exercise of his stock options and provide him with a determination of the fair market value of its stock so he can effectuate his acquisition of those shares. Accordingly, Dannhauser brings this action to force TSG to do so.

42. Dannhauser has been harmed by TSG's erroneous calculation of the commissions to which he is entitled and resulting failure to pay him those commissions. Accordingly, Dannhauser brings this action to recover the prior commissions he was not paid, and also to ensure that his future commissions will be properly calculated and paid.

43. Dannhauser has been harmed by TSG's unreasonable and unenforceable interpretation of his covenants of nondisclosure, noncompetition, and noninterference. In doing so, TSG has prevented Dannhauser from considering new employment opportunities. Accordingly, Dannhauser brings this action to preclude TSG's improper restraints on his ability to obtain new employment.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Breach of Contract

44. Dannhauser repeats and re-alleges the allegations set forth in Paragraphs 1 through 43.

45. The Marketing Agreement, as amended, is a valid and enforceable contract.

46. Dannhauser fully performed all his obligations under the Marketing Agreement.

47. Pursuant to the terms of the Marketing Agreement, as amended, Dannhauser was entitled to receive bi-monthly payment of commissions during the term of his relationship with TSG, and also is entitled to receive bi-monthly payment of commissions for an additional two years from the date of termination of the Marketing Agreement.

48. TSG has breached, and is continuing to breach, the Marketing Agreement, as amended, by, among other things, failing to pay Dannhauser all the commissions that were and are due and owing to him pursuant to the Marketing Agreement.

49. As a direct result of TSG's breaches, Dannhauser has suffered damages and is entitled to an award in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### Declaratory Judgment

50. Dannhauser repeats and re-alleges the allegations set forth in Paragraphs 1 through 49.

51. An actual, ripe, and justifiable controversy has arisen and now exists between Dannhauser and TSG in connection with the First and Second Stock Option Agreements. Specifically, Dannhauser contends that his termination was wrongful and not for "cause" within the meaning of the First and Second Stock Option Agreements. He contends that he is entitled to

exercise his stock options and pay for them with shares of TSG common stock, which necessitates that TSG's Board of Directors make a good faith determination of the fair market value of its stock. TSG, however, contends that it terminated Dannhauser for cause, which also resulted in the termination of his stock options and precludes the need for its Board to determine the fair market value of its stock.

52. An actual, ripe, and justifiable controversy has arisen and now exists between Dannhauser and TSG in connection with the Marketing Agreement. Specifically, Dannhauser contends that, based on its method of calculating his prior commissions, TSG will continue to fail to properly calculate the future commissions to which he is entitled under the Marketing Agreement, as amended. TSG, however, contends that it has properly calculated, and will continue to properly calculate, the commissions due and owing to Dannhauser pursuant to the Marketing Agreement, as amended.

53. An actual, ripe, and justifiable controversy has arisen and now exists between Dannhauser and TSG in connection with the Noncompetition Agreement. Specifically, Dannhauser contends that the Noncompetition Agreement is unreasonable and unenforceable to the extent that it purports to preclude him from contacting TSG clients for services that are wholly unrelated to the court reporting and video services offered by TSG, and from pursuing potential marketing opportunities at ediscovery and translation services firms that do not provide court reporting and video services. TSG, however, contends that it will fully enforce the Noncompetition Agreement and has refused to confirm that it will not enforce the Noncompetition Agreement in connection with ediscovery and translation services firms that are wholly unrelated to TSG's court reporting and video services.

54.   A determination of the foregoing disputes is necessary and appropriate at this time to resolve the adverse interests of Dannhauser and TSG. Dannhauser requests that the Court resolve those disputes.

### THIRD CAUSE OF ACTION
#### Attorneys' Fees

55.   Dannhauser repeats and re-alleges the allegations set forth in Paragraphs 1 through 54.

56.   Dannhauser correctly contends that TSG has underpaid his prior commissions by more than five percent. Dannhauser also correctly contends that TSG will continue to fail to properly calculate and pay his future commissions. Thus, Dannhauser is entitled to recover his attorneys' fees and expenses pursuant to the terms of the Marketing Agreement, as amended.

57.   Dannhauser correctly contends that TSG's interpretation of the Noncompetition Agreement is unreasonable and unenforceable under the circumstances. Thus, as the prevailing party, Dannhauser is entitled to recover his attorneys' fees and expenses pursuant to the terms of the Noncompetition Agreement.

### VI.

### DEMAND FOR RELIEF

WHEREFORE Dannhauser respectfully requests that this Court enter a judgment against TSG and in favor of Dannhauser on each and every claim, awarding Dannhauser the following relief:

   a) Damages in an amount to be determined at trial;

   b) Declaratory relief that the termination of Dannhauser's relationship with TSG was wrongful and not for "cause" within the meaning of the First and Second Stock Option Agreements, entitling him to exercise his stock options and pay for them with shares of TSG common stock, which necessitates that TSG's Board of Directors make a good faith determination of the fair market value of its stock;

c) Declaratory relief that, based on its method of calculating his prior commissions, TSG will continue to fail to properly calculate the future commissions to which Dannhauser is entitled pursuant to the Marketing Agreement, as amended;

d) Declaratory relief that Dannhauser's future commissions should be (i) a single commission at his highest commission percentage when his corporate "Clients" within the meaning of the Marketing Agreement direct their law firms to use TSG's court reporting and video services, or (ii) absent such a relationship with a corporate "Client," a split commission at the correct applicable split commission percentage when he has a relationship with the particular law firm that qualifies as a "Client" within the meaning of the Marketing Agreement;

e) Declaratory relief that TSG must implement a procedure pursuant to which it will properly identify all of Dannhauser's corporate and law firm "Clients" to ensure that he is correctly paid the single and split commissions, respectively, to which he is entitled pursuant to the Marketing Agreement, as amended;

f) Declaratory relief that the Noncompetition Agreement is unreasonable and unenforceable to the extent that it purports to preclude Dannhauser from contacting TSG clients for services that are wholly unrelated to the court reporting and video services offered by TSG, and from pursuing potential marketing opportunities at ediscovery and translation services firms that do not provide court reporting and video services;

g) Interest, costs, and disbursements of this action, including attorney's fees; and

h) Such other and further relief as this Court deems just and proper.

Dated: New York, New York
April 15, 2016

Respectfully submitted,

By: /s/ Chael J. Clark
William A. Brewer III
Michael L. Smith
Chael J. Clark
**BREWER, ATTORNEYS & COUNSELORS**
750 Lexington Ave., 14th Floor
New York, New York 10022
Telephone: (212) 489-1400

**ATTORNEYS FOR PLAINTIFFS**