*Confidential Settlement Agreement*

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This settlement agreement and general release (the "Agreement") is entered into by and on behalf of Todd Dannhauser ("Dannhauser"), TD Co., L.P., ("TD Co., L.P.") (erroneously identified in certain agreements as TD & Co., L.P. and/or TD Co. I, LLC), TSG Reporting, Inc. ("TSG"), and Michael Rixon ("Rixon"), and is effective as of December 14, 2017 (the "Effective Date"). Dannhauser, TD Co., L.P., TSG, and Rixon are collectively referred to herein as the "Parties" or, separately, as a "Party."

WHEREAS, on February 1, 2016, Dannhauser and TD Co., L.P. commenced an action in the United States District Court for the Southern District of New York against TSG under Index Number 16-CV-00747(CM), and TSG counterclaimed against Dannhauser and TD Co., L.P. in that same action (hereinafter, the "Action");

WHEREAS, in order to avoid the time and expense of litigation, the Parties hereto, without making any admissions as to the merits of the pending claims, desire to settle fully and finally any and all of the differences and potential differences between them;

NOW, THEREFORE, intending to be legally bound hereby, and in receipt of good and valuable consideration, including the mutual agreements contained herein, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. <u>Dismissal of Action.</u> Dannhauser, TD Co., L.P., and TSG shall dismiss the Action in full, with prejudice, and without costs to any Party, by executing and filing a stipulation of voluntary dismissal, in the form attached as Exhibit A, no later than three (3) business days after the execution of the Agreement, but in no event later than December 19, 2017.

2. <u>Payments by TSG Relating to Marketing Payments</u>. TD Co., L.P. and TSG, are parties to a Marketing Agreement, as amended, a true and correct copy of which (including all

amendments thereto) is attached hereto as Exhibit B (as amended, the "Marketing Agreement"). In the Action, TD Co., L.P. alleged that TSG did not pay, in full, to TD Co., L.P., certain commissions (the "Commissions") and quarterly profit sharing payments (the "Override Payments"), and that such alleged underpayments by TSG to TD Co., L.P. may continue for the remainder of the payment term (the "Tail") of the Marketing Agreement, which expired on November 5, 2017 (the "Tail Payments"). Together, the Commissions and Override Payments payable pursuant to the Marketing Agreement are referred to in this Agreement as the "Marketing Payments."

    2.1.   In full and complete settlement of all claims for Marketing Payments, past, present, and future, the Parties have agreed:

    a)  to fix the remaining Tail Payments to TD Co., L.P., in the amounts the parties agreed in February 2017, as follows:

    (i)  █████ in payments by TSG to TD Co., L.P., in █████ bi-monthly installments of █████, beginning with the █████ payment made by TSG on or about February 15, 2017 and ending with a single payment of █████ on or about November 15, 2017; the parties agree and acknowledge that all of these payments were timely made by TSG; and

    (ii)  █████ in payments by TSG to TD Co. L.P., in █████ consecutive monthly payments of █████, beginning with the first payment on or about December 1, 2017; the parties agree and acknowledge that the first payment was timely made by TSG.

    2.2.   It is understood and agreed that the payments described in paragraph 2.1:

   (i) were and are made by TSG to TD Co., L.P. in lieu of any future payments due or payable by TSG to TD Co., L.P. under the Marketing Agreement;

   (ii) were and are the sole remaining Marketing Payments obligations of TSG to TD Co., L.P.;

   (iii) satisfy any claims for unpaid Marketing Payments, whether past or future; and

   (iv) replace and supersede any and all Marketing Payments obligations between TSG and TD Co., L.P.

  3. <u>Stock Option Exercise</u>. As of the date of his termination, Dannhauser held vested options to purchase ▮▮▮ Class A Common Shares at ▮▮▮ per share (the "Class A Options") and options to purchase ▮▮▮ Class B Common Shares at ▮▮▮ per share (the "Class B Options") (the Class A Options and Class B Options, together, the "Options"). In order to settle the claims among the Parties, TSG hereby agrees to acknowledge the exercise of the Options as of January 2, 2016, the date of Dannhauser's notice of election to exercise the Options. Dannhauser elected to exercise the Options on a cashless exercise basis, subject to a determination of the fair market value of TSG. If the per share fair market value of TSG, calculated on a fully diluted basis as of January 2, 2016, determined in accordance with paragraphs 4.1 and 4.2 (the "January 2016 Per Share Market Value"), is: (i) less than the exercise price of either the Class A Options or Class B Options; or (ii) less than the exercise price of both of the Class A Options and Class B Options, such "out-of-the-money" option(s) shall be deemed cancelled and no shares shall be issued or deemed issued in respect of such "out-of-the-money" options. If the January 2016 Per Share Market Value exceeds: (i) the exercise price of either the Class A Options or Class B Options; or (ii) the exercise price of both of the Class A Options and Class B Options, such "in-the-money"

option(s) shall be deemed exercised on a cashless exercise basis and the number of shares issued shall be calculated as follows:

$$CS = WCS \times \frac{(MP - EP)}{MP}$$

where:

"CS" equals the number of shares deemed issued to the holder under such option;

"WCS" equals the total number of shares purchasable under such option;

"MP" equals the January 2016 Per Share Market Value; and

"EP" equals the exercise price of the applicable option.

The total number of Dannhauser's shares deemed issued based upon the January 2016 Per Share Market Value shall be referred to as the "Option Shares." All other shares underlying the Options shall be cancelled in order to pay the exercise price for the Option Shares and such cancelled shares shall not be included in the number of Option Shares.

4. **Stock Purchase by TSG**. Excluding his Option Shares, Dannhauser owns ▇▇ Class A shares of TSG. Dannhauser owns no Class B shares of TSG. For purposes of this Agreement, the ▇▇ Class A shares and the Option Shares deemed issued upon exercise of Dannhauser's options are collectively referred to herein as Dannhauser's "Total Shares." TSG hereby purchases Dannhauser's Total Shares, which are deemed repurchased and cancelled and no longer outstanding as of the Effective Date. TSG shall pay Dannhauser the "Purchase Price," defined in paragraph 4.1, for his Total Shares in accordance with the terms set forth below. The Parties agree that as of the Effective Date, Dannhauser ceases to be a shareholder of TSG and that TSG hereby grants Dannhauser a security interest in all TSG's assets to secure the payment of the Purchase Price due and payable to him in accordance with this Agreement. TSG authorizes Dannhauser to file the UCC-1 attached as Exhibit C to evidence such security interest. Dannhauser agrees to file

a UCC termination statement within three (3) business days after TSG has made the final payment of the Purchase Price payable under this Agreement.[1]

    4.1. The Parties will engage Empire Valuation Consultants ("Empire"), located at 350 Fifth Avenue, New York, New York, to perform an appraisal of both (i) the fair market value[2] of TSG and (ii) a per share fair market value on a fully diluted basis, as of two dates:

> a) January 2, 2016 (the date of Dannhauser's notice of election to exercise the Options), so that Empire can determine the January 2016 Per Share Market Value and the number of TSG shares issuable to Dannhauser pursuant to a cashless exercise of his "in-the-money" options in accordance with paragraph 3 above; and
>
> b) May 31, 2017 (the "Valuation Date"), so that Empire can determine a Valuation Date per share fair market value without discount or reduction based upon Dannhauser's minority equity position (the "Valuation Date Per Share Market Value") in order to determine the amount TSG is obligated to pay (in accordance with the terms set forth in paragraph 4.3) in consideration for its repurchase of

---

[1] TSG has obtained a line of credit of up to ▮▮▮▮ (the "LOC") from Astoria Bank (the "Bank"). Dannhauser agrees that his security interest is fully subordinated to the Bank, and that if so requested by the Bank he will sign a standard form of subordination agreement from the Bank and related documents ("Subordination Documents") when the Purchase Price amount is determined. Dannhauser agrees that his security interest will continue to be subordinated to any extension, renewal, or replacement of the LOC with the Bank up to the same amount, or – in the event the LOC is replaced – a new lender to the same extent and up to the same amount ▮▮▮▮ as the original LOC, and that he will execute new Subordination Documents required by the Bank or new lender for such extension, renewal, or replacement of the LOC consistent with the foregoing. If, after receiving Subordination Documents, Dannhauser does not execute such Subordination Documents or new Subordination Documents within 10 days, he agrees that his security interest automatically terminates without any further action required and, in such event, Dannhauser authorizes TSG to take necessary steps, if any, to evidence the termination of his security interest.

[2] "fair market value" is defined to mean the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant and material facts. For the avoidance of doubt, this definition is not meant to alter or undermine the instruction the Parties will give to Empire set forth in the last sentence of paragraph 4.1.1 of this Agreement.

Dannhauser's Total Shares (hereinafter, the "Purchase Price") as of the Effective Date.

The determinations of Empire of the fair market value of TSG and a per share fair market value on a fully diluted basis as of the two dates described in this paragraph 4.1 will be final and binding on the Parties with no right of challenge or appeal.

4.1.1. With respect to Empire's engagement, TSG and Dannhauser agree that (i) TSG will provide Empire with (w) the documents and information possessed by TSG that are requested by Empire both before and during the appraisal process, (x) TSG's general ledger in native format with respect to the "Cost of operations" and "Selling, general, and administrative expenses" as reported in TSG's Financial Statements for the years ended December 31, 2014, 2015, and 2016 (the "Ledger Information"), and (y) the materials TSG provided to the Bank in order to obtain the LOC, excluding personal information of any individual(s) and information that post-dates the Valuation Date, (ii) TSG will provide to Dannhauser the Ledger Information in native format and all documents and information TSG provides to Empire (collectively, the "Appraisal Materials") at least seven (7) days prior to the meeting with Empire described in this section 4.1.1, subparagraph (iv), in the same form TSG provides or intends to provide the Appraisal Materials to Empire, with the exception set forth in footnote 3 below[3], (iii) TSG will certify that it has complied with the foregoing obligations by executing and delivering to Dannhauser or his counsel an affidavit in the form attached as Exhibit D, and (iv) prior to the commencement of the appraisal, TSG and Dannhauser will schedule a meeting with Empire for the purpose of answering any

---

[3] Because Dannhauser has confirmed his intention to compete with TSG after his Noncompetition Agreement expired in November 2017, TSG may redact competitively sensitive and proprietary information from the copies of the materials it provides to Dannhauser, without redacting the data relevant to the valuation; TSG will include a description of the subject of the redactions in what it provides to Dannhauser. Thus, for example, if Empire were to request compensation information for TSG personnel, TSG will so provide it; the copy to Dannhauser will be redacted only to remove the names of the individuals whose compensation is listed.

questions Empire may wish to direct to TSG and Dannhauser, and to allow Dannhauser and TSG or their representatives to make and respond to suggestions regarding information or documentation that may be relevant to Empire in making its determinations; for the avoidance of doubt, as an independent appraiser Empire is free to consider such suggestions and responses as it sees fit. The Parties shall also disclose to Empire that Dannhauser's Noncompetition Agreement (addressed in paragraph 6, below) expired on November 5, 2017, and shall instruct Empire to assume that Dannhauser began performing services (including referring business) for one of the Direct Competitors (defined in paragraph 6, below) beginning December 1, 2017.

4.1.2. The Parties (i) represent and warrant that neither they nor their representatives have had any contact with Empire since October 2016, and (ii) further agree that except for the joint meeting and agreed communications with Empire described in paragraph 4.1.1 above, neither the Parties nor their representatives will initiate any meetings or communications with Empire. The Parties will instruct Empire that in the event it wishes to speak with one or more of the Parties or their representatives, Empire must first provide reasonable advance notice to the representatives designated by TSG and Dannhauser in order to give TSG and Dannhauser or their representatives an opportunity to be included in the communication to be initiated by Empire.

4.1.3. Before Empire is engaged to perform the appraisal as described in paragraph 4.1, the Parties will receive a firm quote of the cost of the appraisal from Empire. The cost of the appraisal will be shared equally between Dannhauser and TSG, and each of Dannhauser and TSG will pay Empire his or its one-half share directly.

4.2. The phrase "on a fully diluted basis" shall mean that all "in-the-money" outstanding options of TSG, as of the relevant determination dates, shall be deemed exercised on a cashless exercise basis in accordance with the formula in paragraph 3; provided, however, that for the calculation described in clause (b) of paragraph 4.1, the formula term "MP" means "Valuation Date Per Share Market Value" and not "January 2016 Per Share Market Value." On January 2,

2016, there were ▮▮▮▮ outstanding options to purchase Class A Common Shares of TSG and 2,600 outstanding options to purchase Class B Common Shares of TSG (these numbers do not include Dannhauser's Options). On the Effective Date, and again excluding Dannhauser's Options, there are ▮▮▮▮ outstanding options to purchase Class A Common Shares of TSG, and ▮▮▮▮ outstanding options to purchase Class B Common Shares of TSG.

    4.3.    (a)    TSG will pay the Purchase Price to Dannhauser for his Total Shares in equal monthly installments, up to a maximum of ▮▮▮▮ per twelve-month period, until the Purchase Price is paid in full. The amount of time it will take TSG to pay the Purchase Price in full to Dannhauser is referred to herein as the "Payout Period." The first payment of the Payout Period will be made by TSG on or before the fifth business day following the Effective Date, and the monthly payments will thereafter be made on the first business day of each successive month. Each of the payments made by TSG prior to the receipt of Empire's determinations (as set forth in paragraph 4.1) will be in the amount of ▮▮▮▮. If the Purchase Price is determined to result in monthly payments that are less than ▮▮▮▮, then TSG will be entitled to recoup the amount it overpaid.

        (b)    Provided that TSG is given at least sixty (60) days written notice by Dannhauser, then at any time during the Payout Period, Dannhauser may exercise his option to require TSG to shorten the Payout Period, and TSG will do so, on the understanding that the resulting increase in payments may not exceed ▮▮▮▮ per twelve-month period or ▮▮▮▮ monthly. In the event that Dannhauser exercises his option to require TSG to shorten the Payout Period, TSG will be entitled to discount the remaining unpaid amount of the Purchase Price by 2% for each month by which the Payout Period is shortened. This discount will be applied against the total amount owing as of the date that the shortened Payout Period takes effect.

(c) Using an example of a Purchase Price of $1.2 million, the Payout Period is 36 months. If Dannhauser elects at the outset of the Payout Period before the first installment is paid by TSG to Dannhauser to require TSG to pay him in 30 months, thereby reducing the Payout Period by six months, Dannhauser may do so. In that event, the Purchase Price would be reduced by 12 percent (six (6) months x 2% per month) to $1,056,000.00, which TSG would pay in equal monthly installments for 30 months. Similarly, if Dannhauser elects to shorten his Payout Period by six months, beginning with the 13th installment, then the remaining amount of the Purchase Price owed as of the 13th installment would be $704,000.00 (that is, $800,000.00 reduced by 12%), which would be paid in equal monthly installments over the remaining 18 months.

5. <u>Tax Treatment</u>. Dannhauser and TD Co., L.P. are solely responsible for reporting and paying to the appropriate federal and state taxing authorities any payments that may be required to satisfy any and all tax liabilities and/or withholding obligations in connection with the payments being made to Dannhauser and TD Co., L.P. pursuant to this Agreement.

6. <u>Noncompetition Agreement</u>. The Noncompetition Agreement, dated as of November 15, 2010, as amended by that certain Amendment to the Noncompetition Agreement, dated as of September 15, 2012 (as amended, the "Noncompetition Agreement") expired on November 5, 2017 (the "Expiration Date"). (A true and correct copy of the Noncompetition Agreement is attached hereto as Exhibit E.) By agreeing to dismiss the Action, with prejudice, Dannhauser and TD Co., L.P. waive any right to challenge the enforceability or reasonableness of the Noncompetition Agreement in the future. For purposes of paragraph 4.1.1, the following businesses that compete directly with TSG are "Direct Competitors" of TSG: VeriText (including LawStudio), Transperfect Legal Solutions, NextGen Reporting, DTI, or HG Litigation Services.

7. <u>Payments to Dannhauser.</u> TD Co., L.P. and Dannhauser hereby instruct TSG to make future payments pursuant to this Agreement by electronic wire transfer to TD Co., L.P. and Dannhauser (as the case may be) care of Brewer, Attorney's and Counselors in accordance with

wire transfer instructions set forth on Exhibit F, attached hereto.

8.  **Reference Request.** TSG will provide to or on behalf of Dannhauser (if he so requests) a neutral employment reference which will set forth: (i) the dates of Dannhauser's employment; and (ii) Dannhauser's position and/or title as of the date of Dannhauser's departure from TSG.

9.  **General Releases.** With the exception of the Parties' respective obligations going forward as expressly set forth in this Agreement:

> (a) Dannhauser and TD Co., L.P., on behalf of themselves, and on behalf of their past, present and future parent companies, subsidiaries, affiliates, divisions, partners, real or alleged alter egos, and their respective agents, employees, directors, principals, owners, shareholders, successors, heirs, estates, and assigns, including but not limited to TD Co. I, LLC and TD & Co., L.P., do hereby forever release and discharge Rixon, TSG, and ADP Total Source, and each of their past, present and future parent companies, subsidiaries, affiliates, divisions, partners, their respective real or alleged alter egos, managers, shareholders, directors, officers, employees, agents, representatives, attorneys, accountants, predecessors, insurers, successors, heirs, estates, and assigns of and from any and all claims, demands, actions, causes of action or suits at law or equity, debts, sums of money, accounts, controversies, rights, damages, costs, attorneys' fees, losses, expenses, contracts, torts, agreements, promises or liabilities of whatever kind or nature, whether known or unknown, asserted or unasserted, suspected or claimed, from the beginning of time to the Effective Date, including but not limited to (i) those claims that were asserted or could have been asserted by Dannhauser and TD Co., L.P. in the Action and those claims that Dannhauser and TD Co., L.P. alleged in their draft second amended complaint (which is attached hereto as Exhibit G) against TSG, Rixon, and ADP Total Source; (ii) any claims arising out of or relating to Dannhauser's February 17, 2017 demand to inspect the books and records of TSG, which demand is withdrawn, or his status until the Effective Date as an owner of TSG shares, which are purchased by TSG pursuant to this Agreement; and (iii) any claims arising from or relating to Dannhauser's employment by TSG or the cessation

and termination of that employment, including, without limitation, any claims for back pay, bonuses, incentive compensation, severance or vacation benefits, unpaid wages, reinstatement, reimbursement of expenses, or for recovery of any losses or other damages based on any alleged discrimination on account of race, religion, sex, marital status, veteran status, physical or mental disorders or disability, or age, including, without limitation, any alleged violation of Title VII or the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq.; the Age Discrimination in Employment Act of 1967, 29 U.S.C. Section 621, et seq.; the Americans with Disabilities Act of 1990, 42 U.S.C. Section 12101 et seq.; the Americans with Disabilities Act Amendments Act of 2008; the Employment Retirement Income Security Act of 1974, 29 U.S.C. Section 1001 et seq.; Sections 503 and 504 of the Rehabilitation Act, the Family and Medical Leave Act, the New York Human Rights Law, the New York Labor Law, the New York Civil Rights Law, the New York City Human Rights Law, the statutes, including the Texas Labor Code, and regulations of Texas and its municipalities, or any other federal, state or local statutory or common law.

(b) TSG and Rixon, on behalf of themselves, and on behalf of their past, present and future parent companies, subsidiaries, affiliates, divisions, partners, real or alleged alter egos, and their respective agents, employees, directors, principals, owners, shareholders, successors, heirs, estates, and assigns, do hereby forever release and discharge Dannhauser and TD Co., L.P., and each of their past, present and future parent companies, subsidiaries, affiliates, divisions, partners, their respective real or alleged alter egos, managers, shareholders, directors, officers, employees, agents, representatives, attorneys, accountants, predecessors, insurers, successors, heirs, estates, and assigns, including but not limited to TD Co. I, LLC and TD & Co., L.P., of and from any and all claims, demands, actions, causes of action or suits at law or equity, debts, sums of money, accounts, controversies, rights, damages, costs, attorneys' fees, losses, expenses, contracts, torts, agreements, promises or liabilities of whatever kind or nature, whether known or unknown, asserted or unasserted, suspected or claimed, from the beginning of time to the Effective Date, including but not limited to those claims that were asserted or could have been asserted by TSG or Rixon in the Action, and including but not limited to the counterclaims asserted by TSG in the Action.

(c) The Parties respectively represent and warrant that, with the exception of the Action: (i) the Parties have not filed, have not caused to be filed, and are not presently a party to any claim or action or charge against another Party; (ii) the Parties are the owners of all rights, claims, demands, and causes of action which are being released in this Agreement and have not sold, assigned, or otherwise transferred any such claims, rights, demands, or causes of action; and (iii) the Parties have not sold, assigned, conveyed, or otherwise transferred any claim or demand which the Parties are now releasing.

10. <u>Non-Disparagement.</u> Neither Dannhauser nor TD Co., L.P. will take any action, directly or indirectly, which is intended to or would reasonably be expected to disparage, be injurious to the reputation or interests of, lead to unwanted or unfavorable publicity, or materially harm TSG or Rixon or their businesses, officers, directors, or employees. Nor will Dannhauser or TD Co., L.P. take any actions to encourage or induce, either directly or indirectly, others to take such action that is intended to or would reasonably be expected to disparage, be injurious to the reputation or interests of, lead to unwanted or unfavorable publicity, or materially harm TSG or Rixon or their businesses, officers, directors, or employees. Neither Rixon nor TSG will take any action, directly or indirectly, which is intended to or would reasonably be expected to disparage, be injurious to the reputation or interests of, lead to unwanted or unfavorable publicity, or materially harm Dannhauser or TD Co., L.P. or their businesses, officers, directors, or employees. Nor will Rixon or TSG take any actions to encourage or induce, either directly or indirectly, others to take such actions that is intended to or would reasonably be expected to disparage, be injurious to the reputation or interests of, lead to unwanted or unfavorable publicity, or materially harm TSG or Rixon or their businesses, officers, directors, or employees. Notwithstanding the foregoing, should the Parties compete against each other after November 5, 2017, the expiration date of the Noncompetition Agreement, then truthful business-related statements made in a good effort to compete do not violate the foregoing non-disparagement obligations.

11. <u>Confidentiality</u>.  The terms and conditions of this Agreement and the appraisal determinations issued by Empire (collectively, the "Confidential Information") shall be held in the strictest confidence by the Parties and shall not be publicized or disclosed in any manner whatsoever other than as necessary to carry out this Agreement's provisions.  Notwithstanding the foregoing restrictions, the Parties may disclose Confidential Information: (i) to their auditors, accountants, regulators, shareholders, lenders, investors, or attorneys; (ii) as may be reasonably necessary to enforce each Party's rights under this Agreement, or any of the rights or obligations incurred pursuant hereto; (iii) to taxing authorities; or (iv) as required by court order or law.  Any disclosures pursuant to this paragraph shall be accompanied by the express direction that confidentiality must be maintained by any such recipient of the information described herein.

12. <u>Destruction of Litigation and Appraisal Materials</u>.  Within thirty (30) days of the Effective Date, the Parties shall destroy all materials obtained in discovery, all other documents containing information obtained in discovery, and all copies thereof made by or on behalf of the receiving Parties.  Notwithstanding anything to the contrary, counsel of record for the Parties may retain copies of documents constituting work product, and any materials not designated as Confidential pursuant to the Confidentiality Stipulation and Order entered by the Court on August 2, 2016, in this Action.  Counsel shall not disclose confidential information contained in counsel's work product to any third parties absent lawful subpoena or court order.

12.1.  Within three (3) days of the issuance of Empire's determinations pursuant to paragraph 4.1, Dannhauser and his representatives shall destroy all Appraisal Materials, all other documents containing information copied or derived from the Appraisal Materials, and all copies thereof made by or on behalf of Dannhauser.  TSG shall retain and preserve a complete copy of all Appraisal Materials for 30 days after the issuance of Empire's determinations.

13. <u>Amendments</u>.  This Agreement shall not be modified or amended except by written instrument executed by all Parties hereto.  No breach of any provision of this Agreement shall be

deemed waived unless the waiver is in writing signed by a duly authorized representative of the waiving Party. Waiver of any one breach shall not be deemed a waiver of any other breach of the same or any other provision of this Agreement.

14. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the Parties, and supersedes any prior agreements or understandings between the Parties, which are hereby terminated and of no further force and effect, including but not limited to: the Marketing Agreement; the Stock Option and Shareholders Agreement (dated August 21, 2008); the Amendment to Stock Option and Shareholder Agreement (dated November 15, 2010); the Stock Option and Shareholders Agreement for ▮▮▮▮ Shares of Class A Voting Stock (dated September 15, 2012); the Stock Option and Shareholders Agreement for ▮▮▮▮ Shares of Class B Non-Voting Stock (dated September 15, 2012), the Shareholders Agreement dated as November 15, 2010; the Amended and Restated Co-Sale Agreement (dated as of November 15, 2010) and the Amendment to the Amended and Restated Co-Sale Agreement (dated as of September 15, 2012).

15. <u>No Admission of Liability</u>. The Parties have entered into this Agreement in settlement of contested issues before any trial of the Action or determination or finding by the Court as to the merits of any claim or counterclaim. The execution of this Agreement shall not constitute an admission of liability by any Party, or that such Party has committed any wrongdoing, breached any agreement, or violated any federal, state, or local statute, ordinance, rule regulation or common law.

16. <u>Drafter</u>. This Agreement shall not be construed against the Party preparing it, but shall be construed as if all Parties collaboratively prepared it and any uncertainty or ambiguity shall not be interpreted against any Party. In the event any provision of this Agreement is found to be invalid or otherwise unenforceable, the remainder of the Agreement shall remain fully valid and enforceable.

17. <u>Successors</u>. This Agreement shall be binding upon and enforceable by the Parties, their parent corporations, successors, assigns, heirs, executors, administrators and guardians, and all other persons and entities claiming an interest in the subject matter hereof through the Parties.

18. <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted so as to be effective and valid under applicable law. If any provision of this Agreement is held to be prohibited by, or invalid under, applicable law, the remainder of this Agreement and any other application of such provision shall not be affected thereby.

19. <u>Notice</u>. Should any notice, request, demand, claim or other communication be delivered, given or otherwise provided under this Agreement by any of the Parties, it must be in writing and must be delivered, given or otherwise provided (a) by hand (in which case, it will be effective upon delivery), and e-mail or (b) by overnight delivery by a nationally-recognized courier service (in which case, it will be effective on the business day after being deposited with such courier service), and e-mail; and in each case, to the addresses listed below:

If to Plaintiffs:

William A. Brewer III
Michael L. Smith
Brewer, Attorneys & Counselors
750 Lexington Avenue, 14th Floor
New York, NY 10022
wab@brewerattorneys.com
mls@brewerattorneys.com

If to TSG:

Michael Rixon
TSG Reporting, Inc.
Nationwide - Worldwide
Corporate Headquarters
747 Third Avenue - 10th Floor
New York, NY 10017
mrixon@tsgreporting.com

with a copy sent simultaneously and in like manner and by e-mail to:

Zukerman Gore Brandeis & Crossman, LLP
Eleven Times Square
New York, New York 10036
Attn: Joseph Maloney, Esq. and Edward Powers, Esq.
jmaloney@zukermangore.com
epowers@zukermangore.com

If to Rixon:

Michael Rixon
█████████████████
New York, New York 10017
█████████

with a copy sent simultaneously and in like manner and by e-mail to:

Zukerman Gore Brandeis & Crossman, LLP
Eleven Times Square
New York, New York 10036
Attn: Joseph Maloney, Esq. and Edward Powers, Esq.
jmaloney@zukermangore.com
epowers@zukermangore.com

Each of the Parties to this Agreement may specify different notice recipients or notice addresses by giving notice of that change to each of the other Parties hereto in accordance with this Paragraph.

20.   <u>Acknowledgements</u>.  Each Party respectively acknowledges that he or it fully understands the provisions of this Agreement and their effect and that he or it is signing this Agreement voluntarily and free from duress. The Parties to this Agreement acknowledge that they have had the opportunity to discuss the matter with legal counsel, and enter into this Agreement after such consultation.

21.   <u>Governing Law and Situs of Execution</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to principles of conflict of laws. The Parties irrevocably submit to the exclusive jurisdiction and venue of the United States District Court for the Southern District of New York (the "Court") to hear any action arising out of, based upon, or relating to this Agreement.  The Parties will file this Agreement

under seal in accordance with the Confidentiality Stipulation and Order entered by the Court on August 2, 2016. Pursuant to the form of Order of Dismissal, attached hereto as Exhibit A, to be "so ordered" and entered by Chief United States District Judge Colleen McMahon in the Action, the Parties will jointly request the Court to retain jurisdiction to enforce the Agreement without requiring it to be publicly filed. If Judge McMahon declines to do so absent public filing of the Agreement, then the Parties will request that Judge McMahon permit the Parties to publicly file a partially redacted version of the Agreement. The Parties agree that the publicly filed redacted version of the Agreement would redact, among other things, financial information, information relating to ownership and/or control of TSG, and business-sensitive information, including settlement payment, stock, and option information, as contemplated by paragraph 2 of the Confidentiality Stipulation and Order. Pursuant to paragraph 20 of the Confidentiality Stipulation and Order, the Parties agree to identify to Judge McMahon that information sought to be redacted and jointly explain to Judge McMahon why that information is confidential. If Judge McMahon declines to permit a redacted version of the Agreement to be publicly filed, then the Parties will withdraw the request to the Court to retain jurisdiction to enforce the Agreement. In that event, the Parties agree that any action brought to enforce any term of this Agreement will be filed in the Court and designated a "related case" so that it will be assigned to Judge McMahon and that no Party will file the Agreement in the public record in such new action.

22.     <u>Authority</u>. Each Party respectively represents and warrants that it and he are fully authorized to enter into the terms and conditions of, and to execute and be bound by, this Agreement.

23.     <u>Execution</u>. This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument. All such counterparts together shall constitute one and the same Agreement. A facsimile, electronic or .pdf signature shall be valid and deemed as an original signature for all purposes hereunder.

**TSG Reporting, Inc.**

_____
By: Michael Rixon
    Chief Executive Officer

State of New York        )
                                    ) ss.:
County of New York    )

On the ____ day of December in the year 2017, before me, the undersigned notary public, personally appeared Michael Rixon, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as the Chief Executive Officer of TSG Reporting, Inc., and that by his signature on the instrument, he executed the instrument.

_____
Notary Public

\* \* \* \* \* \*

_____
**Michael Rixon**

State of New York        )
                                    ) ss.:
County of New York    )

On the ____ day of December in the year 2017, before me, the undersigned notary public, personally appeared Michael Rixon, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his personal capacity, and that by his signature on the instrument, he executed the instrument.

_____
Notary Public

\* \* \* \* \* \*

**TD Co., L.P. (including TD & Co., L.P.)**

       By: TD Co. I, LLC, as General Partner

By: _____
      Name: **Todd Dannhauser**
      Title: Member

State of _____)
                                ) ss.:
County of _____)

On the ____ day of December in the year 2017, before me, the undersigned notary public, personally appeared Todd Dannhauser, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as _____, and that by his signature on the instrument, he executed the instrument.

_____
Notary Public

                                        \* \* \* \* \* \*

_____
**Todd Dannhauser**

State of _____)
                                ) ss.:
County of _____)

On the ____ day of December in the year 2017, before me, the undersigned notary public, personally appeared Todd Dannhauser, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his personal capacity, and that by his signature on the instrument, he executed the instrument.

_____
Notary Public

                                        \* \* \* \* \* \*

**T.D. Co. I, LLC**

_____
By: **Todd Dannhauser**
Title: Member

State of _____ )
                                 ) ss.:
County of _____ )

On the \_\_\_\_ day of December in the year 2017, before me, the undersigned notary public, personally appeared Todd Dannhauser, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as _____, and that by his signature on the instrument, he executed the instrument.


_____
Notary Public