UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/21/19

---

TODD DANNHAUSER, TD CO. I, LLC., TD CO., L.P.,

                  Plaintiffs,

-against-

TSG REPORTING, INC.,

                  Defendant.

16cv00747 (CM) (DF)

REPORT AND
RECOMMENDATION

**TO THE HONORABLE COLLEEN MCMAHON, U.S.D.J.:**

Currently before this Court are both a motion by defendant TSG Reporting, Inc. ("Defendant" or "TSG"), seeking to enforce a settlement agreement reached by the parties in this case, and a cross-motion by plaintiffs Todd Dannhauser ("Dannhauser"), TD Co. I, LLC, and TD Co., L.P. (collectively, "Plaintiffs"), also seeking to enforce the parties' agreement, but differing as to what such enforcement should entail. Although the parties' dispute over who has breached the settlement agreement and how it should be enforced was referred to this Court for resolution, precedent suggests that a magistrate judge would lack the authority to rule on a motion to enforce a settlement. Accordingly, this Court is addressing the parties' dispute by way of a Report and Recommendation.

For the reasons discussed below, I respectfully recommend that Defendant's motion (Dkt. 97): (1) be granted to the extent that Dannhauser be directed to comply with his obligation under the settlement agreement to pay his one-half share of the fee for the independent appraiser that was tasked, pursuant to the agreement, with determining a fair purchase price for Dannhauser's stock in TSG, and (2) be denied to the extent that Defendant requests an award of

the attorneys' fees it has incurred in seeking enforcement of the agreement. I further recommend that Plaintiffs' cross-motion (Dkt. 101) be denied in its entirety.

## BACKGROUND

### A. Procedural History

#### 1. The Parties' Initial Report of a Settlement in Principle, and Their Apparent Inability To Finalize That Initial Agreement

It has not been easy for the parties to this case to reach a final resolution of the claims raised in this action. Indeed, this case was referred to this Court in April 2016 to assist the parties with settlement, and this Court held multiple telephone conferences with counsel on that subject, as well as a lengthy in-person settlement mediation with the parties in August of that year, but those sessions did not result in an agreement. In early February 2017, however, the parties reported to the Court that they had agreed to a settlement in principle. *(See* Letter to the Court from Preston J. Postlethwaite, Esq., and Edward L. Powers, Esq., dated Feb. 3, 2017 (Dkt. 46).)

Yet, after the Honorable Colleen McMahon, U.S.D.J., conditionally dismissed the case on February 6, 2017 (Order of Dismissal, dated Feb. 6, 2017 (Dkt. 47) (providing 45 days for the action to be reopened if the settlement were not consummated)), Dannhauser, according to Defendant, belatedly made an additional demand regarding the settlement terms. *(See* Affidavit of Joseph E. Maloney, Esq., In Support of TSG Reporting Inc.'s Second Motion To Enforce Settlement Agreement ("Maloney Aff."), sworn to Dec. 19, 2018 (Dkt. 99) ¶ 3.) Specifically, Dannhauser reportedly demanded, for the first time, that Defendant not only purchase Dannhauser's equity interest in TSG (a point that had been agreed), but that, in connection with that purchase, Dannhauser be treated as a secured creditor. *(Id.)* As described by Defendant, this

2

"new demand" by Dannhauser not only necessitated the revision of previously agreed terms, but also required TSG "to establish a new banking relationship with a lender." (*Id.*)

In the ensuing months, Defendant states that it made "extensive efforts" to satisfy Danhauser's demand (*see id.*), to the point where, by July 28, 2017, it considered the parties "close . . . to the finish line" (*Letter to the Court from Edward L. Powers, Esq., dated July 28, 2017 (Dkt. 67)*). Nonetheless, after having already granted several extensions of the 45-day deadline set by the Court's conditional Order of Dismissal, Judge McMahon denied any further extensions, and, on July 31, 2017, reopened the case. (Dkt. 70.)

## 2.   The Parties' Eventual Execution of a Settlement Agreement, and the Court's Dismissal of the Action

The reopening of the case immediately prompted Defendant to write to the Court again, this time stating an intention to move to enforce the unsigned settlement agreement in the form in which it had purportedly been accepted by the parties, back in February 2017. (Letter to the Court from Edward L. Powers, Esq., dated July 31, 2017 (Dkt. 71).) By Order dated August 7, 2017, Judge McMahon afforded Defendant until August 22, 2017, to file that motion (Dkt. 74), but, after some further communication from the parties and a reference to this Court to address the matter, this Court set a modified briefing schedule, requiring Defendant's motion to enforce the settlement to be submitted by November 30, 2017 (Dkt. 79).

Defendant duly filed its motion on November 30, 2017 (Dkt. 80), but then voluntarily withdrew it on December 15, 2017, when the parties finally executed a written settlement agreement. (*See* Letter to the Court from Edward L. Powers, Esq., dated Dec. 15, 2017 (Dkt. 89).) The parties submitted that written agreement to the Court, in unsigned and redacted form, on December 19, 2017 (*see* Dkt. 92), together with a Stipulation of Voluntary Dismissal with Prejudice (Dkt. 93). The Stipulation recited, *inter alia,* that the Court would "retain[] jurisdiction

3

for the purposes of enforcing the [agreement]." (*Id.*) On December 20, 2017, Judge McMahon "so ordered" the parties' Stipulation (*id.*), resulting in a final disposition of the action.

### 3. The Pending Motions To Enforce the Settlement Agreement

Eight months after the Court's unconditional dismissal of the action with prejudice, Plaintiffs wrote to the Court, requesting a conference to address Defendant's supposed failure to comply with the terms of the parties' settlement agreement. (*See* Letter to the Court from Michael L. Smith, Esq., dated Aug. 21, 2019 (Dkt. 94).) Defendant responded by letter, stating that it had, in fact, met all of its obligations under the agreement. (Letter to the Court from Edward L. Powers, Esq., dated Aug. 22, 2018 (Dkt. 95).) On September 5, 2018, Judge McMahon indicated that she would not make any determination on the matter based on the parties' letters, and that if Plaintiffs believed Defendant had breached the agreement, Plaintiffs could file a formal motion, which would then be referred to this Court for adjudication. (Dkt. 96.)

On December 19, 2018, Defendant filed a motion that it framed as a "second" motion to enforce the parties' settlement (Notice of Second Motion To Enforce Settlement Agreement, dated Dec. 19, 2018 (Dkt. 97)), this time addressed not to the parties' original deal, but rather to the final agreement that they had reportedly executed and that had led to their Stipulation of Voluntary Dismissal. In support of its motion, Defendant submitted a memorandum of law (Memorandum of Law in Support of TSG Reporting Inc.'s Second Motion To Enforce Settlement Agreement, dated Dec. 19, 2018 ("Def. Mem.") (Dkt. 98)), and an attorney affidavit (Maloney Aff.) with attached exhibits. As Exhibit 1 to the Maloney Affidavit, Defendant submitted an executed copy of the parties' settlement agreement. (Settlement Agreement,

4

effective as of Dec. 14, 2017, and executed Dec. 15, 2017 ("Settlement Agreement")
(Dkt. 99-1).)

On January 2, 2019, Plaintiffs opposed Defendant's motion and filed a cross-motion, also
purportedly seeking to enforce the parties' agreement. (*See* Notice of Cross-Motion To Enforce
the Settlement Agreement, dated Jan. 2, 2019 (Dkt. 101)[1]; *see also* Plaintiffs Dannhauser's
Memorandum of Law in Opposition to Defendant's Motion To Enforce and in Support of
Dannhauser's Cross-Motion To Enforce the Settlement Agreement, dated Jan. 2, 2018 ("Pl.
Mem.") (Dkt. 101-1); Dannhauser's Affidavit in Opposition to Defendant's Motion To Enforce
and in Support of Dannhauser's Cross-Motion To Enforce the Settlement Agreement, sworn to
Dec. 28, 2018 ("Dannhauser Aff.") (Dkt. 101-2); Affidavit of Jessica A. Huse, Esq., in
Opposition to Defendant's Motion To Enforce and in Support of Dannhauser's Cross-Motion To
Enforce the Settlement Agreement, sworn to Dec. 28, 2018 ("Huse Aff.") (Dkt. 101-3).)

On January 18, 2019, Defendant filed a combined opposition to Plaintiffs' cross-motion
and reply on its own motion. (*See* Reply Memorandum of Law in Further Support of TSG
Reporting Inc.'s Second Motion To Enforce Settlement Agreement and in Opposition to
Dannhuser's Cross-Motion To Enforce the Settlement Agreement, dated Jan. 18, 2019 ("Def.
Reply Mem.") (Dkt. 105); Affidavit of Michael Rixon in Further Support of TSG's Second
Motion To Enforce Settlement Agreement and in Opposition to Dannhauser's Motion To
Enforce, sworn to Jan. 18, 2019 ("Rixon Aff.") (Dkt. 106).) On January 25, 2019, Plaintiffs filed
a reply on their cross-motion. (Reply Memorandum in Further Support of Plaintiffs Todd

---

[1] This Notice of Cross-Motion was improperly filed on the Court's docket as a
Memorandum of Law in response to Defendant's motion. (*See* Dkt. 101.)

5

Dannhauser and TD Co., L.P.'s Cross-Motion To Enforce the Settlement Agreement, dated
Jan. 25, 2019 ("Pl. Reply Mem.") (Dkt. 108).)

## B.    Terms of the Settlement Agreement
That Are at Issue in the Pending Motions

Certain provisions of the Settlement Agreement (including those governing Defendant's
payments to Dannhauser as compensation for his allegedly unpaid commission and for his stock
options) are not at issue in the parties' current motions to enforce the settlement. Nor do the
parties now raise the issue of whether Dannhauser, as he requested at some point, should stand as
a secured creditor with respect to Defendant's agreement to purchase his equity interest in TSG.
Rather, the motions before the Court focus on the provisions of the Settlement Agreement that
relate to the price that Defendant was required to pay to purchase that equity interest, and more
particularly, the method by which a valuation of that interest was to be made.

In entering into the Settlement Agreement, and to resolve their differences as to how
Dannhauser's stock in TSG should be valued, the parties agreed to engage an independent
appraiser, Empire Valuation Consultants ("Empire"), to determine a fair purchase price for that
stock. (See Pl. Mem., at 5; Settlement Agreement ¶ 4.) Dannhauser and TSG each agreed to pay
half of Empire's fees (Settlement Agreement ¶ 4.1.3 ("The cost of the appraisal will be shared
equally between Dannhauser and TSG, and each of Dannhauser and TSG will pay Empire his or
its one-half share directly.")), and, as set out in the Settlement Agreement, the parties also agreed
to detailed terms governing the appraisal process. Specifically, pursuant to paragraph 4.1, TSG
was required to provide Empire with, *inter alia*,

> documents and information possessed by TSG that are requested
> by Empire both before and during the appraisal process . . . [and]
> TSG's general ledger in native format with respect to the 'Cost of
> operations' and 'Selling, general, and administrative expenses' as
> reported in TSG's Financial Statements for the years ended

6

> December 31, 2014, 2015, and 2016 (the 'Ledger
> Information') . . . .

*(Id.* ¶ 4.1.1.) Defendant was also to provide the same materials to Dannhauser, subject to the redaction of "competitively sensitive and proprietary information . . . without redacting the data relevant to the valuation." *(Id.* ¶ 4.1.1 n.3.) For example, if Defendant were to provide Empire with employee compensation information, then it would need to provide the same information to Dannhauser, but the identities of the employees could be redacted. *(Id.)*

Given that the engagement of an independent appraiser was ostensibly motivated by the parties' mutual distrust as to how their adversaries might otherwise go about determining an appropriate stock purchase price, the Settlement Agreement was designed to afford the parties only limited influence over the appraisal process. For example, the agreement provides:

> [P]rior to the commencement of the appraisal, TSG and
> Dannhauser will schedule a meeting with Empire for the purpose
> of answering any questions Empire may [have] . . . and to allow
> Dannhauser and TSG or their representatives to make and respond
> to suggestions regarding information or documentation that may be
> relevant to Empire in making its determinations; for avoidance of
> doubt, as an independent appraiser Empire is free to consider such
> suggestions and responses as it sees fit.

*(Id.* ¶ 4.1.1.) The agreement further states that, apart from the planned joint meeting with Empire, at which the parties could "make and respond to suggestions" *(id.),* the parties would be prohibited from initiating any further meetings or communications with Empire. *(Id.* ¶ 4.1.2.) In addition, beyond the suggestions and responses contemplated by paragraph 4.1.1, the Settlement Agreement affords no party any right to object to an appraisal made by Empire, and expressly states that any valuation determinations made by Empire were to be considered "final and binding on the Parties with no right of challenge or appeal." *(Id.* ¶ 4.1.)

7

## C.   The Appraisal Process to Date

The Settlement Agreement was executed by the parties on December 15, 2017. (*See* Settlement Agreement.)[2] According to TSG, Empire was then formally engaged on April 19, 2018, to conduct an appraisal of the value of Dannhauser's equity interest in TSG. (Maloney Aff. ¶ 9.) Defendant's counsel attests that, working with Defendant, he furnished Empire with the documents and information required by paragraph 4.1.1 of the Settlement Agreement ("including TSG's general ledger in native format with respect to 'Cost of operations' and 'Selling, general, and administrative expenses' for the years specified in [that paragraph]") on June 5, 2018, and that he also sent Dannhauser redacted copies of that material on or near that date. (*Id.* ¶ 11.)

As required by the Settlement Agreement, the parties met with Empire on June 12, 2018. (*Id.* ¶ 12; Dannhauser Aff. ¶ 18.) Dannhauser asserts that, during that meeting, he told Empire's representative that TSG's general ledger was incomplete, that his copies of the documents were too heavily redacted, and that he had knowledge or a suspicion that TSG was engaged in self-dealing. (Dannhauser Aff. ¶¶ 19-21.) Further, although he has submitted no emails or other written communications from Empire to support this, Dannhauser contends that, during the June 12 meeting, "the Empire appraiser agreed that TSG's information [was], in part, lacking in terms of how [certain] expenses were allocated to cost centers in TSG financial statements." (*Id.* ¶ 25.) According to Dannhauser, the appraiser stated, in response to Dannhauser's expressed concerns, "that he [would] look at the unredacted expenses to determine if anything seem[ed]

---

[2] While Dannhauser states in his Affidavit that the Settlement Agreement was executed on its stated effective date of December 14, 2017 (*see* Dannhauser Aff. ¶ 8), the Settlement Agreement itself reflects that it was signed by the parties on December 15, 2017 (*see* Settlement Agreement).

8

improper . . . [but] that his ability to do so [would] be limited simply to the information provided, as Empire was not engaged to conduct a forensic audit, and as such [would] not be conducting a forensic audit of the documents provided by TSG." (*Id.* ¶ 26.) In any event, Defendant's counsel states that, following the meeting, he sent additional documents to Empire and Dannhauser at Empire's request. (Maloney Aff. ¶ 13.)

Empire issued a draft appraisal on August 22, 2018. (*Id.* ¶ 15; Pl. Mem., at 11.) Then, on September 27, 2018, Empire emailed both parties, saying that it "expect[ed] to hear responses from either or both sides as to the report" and asking to schedule a call to discuss the timing of those responses. (Maloney Aff., Ex. 6, at 2-3.) Plaintiffs' counsel initially responded that Danhauser was not available that week, but that counsel would follow up with potential dates the following week. (*Id.*, at 1.) Defendant claims that Plaintiffs' counsel never followed up, and, indeed, later emails with Empire indicate that "no call ha[d] been scheduled." (*Id.*, Ex. 7, at 7.)

Counsel for TSG transmitted its comments on the draft appraisal to Empire on October 17, 2018. (*Id.*) On October 24, 2018, Empire confirmed that it had received payment from TSG, but that it had not yet received payment from Dannhauser. (*Id.*, at 5.) Empire also noted that it had not received comments from Dannhauser and asked that, if Dannhauser had any comments, they be sent "as soon as possible," so that they could be reviewed by Empire "prior to any scheduled conference call." (*Id.*)

On November 14, 2018, Empire informed the parties it would not finalize the appraisal until it received payment of Dannhauser's outstanding balance. (*Id.*, Ex. 8, at 2-3.) The following day, Plaintiffs' counsel replied by email, stating that Dannhauser "object[ed] to the lack of transparency throughout the valuation process" and accusing TSG of breaching its obligations under the Settlement Agreement. (*Id.*, Ex. 9, at 1-2.) According to Plaintiffs'

9

counsel, this alleged lack of transparency resulted in Dannhauser's not having had "sufficient information from which to provide comments as to the draft valuation report." (*Id.*, at 2; *see also* Pl. Mem., at 11.) Plaintiffs' counsel also stated that his November 15, 2018, email would serve as notice of a forthcoming motion to enforce the parties' settlement. (Maloney Aff., Ex. 9, at 2.)

Despite the fact that the appraisal process had stalled, the parties apparently continued to perform other aspects of the Settlement Agreement. Upon the filing of Defendant's motion on December 19, 2018, Defendant's counsel stated that TSG had made "all of the commission-related settlement payments to Plaintiffs" called for by the Settlement Agreement – in the total amount of $414,000 – and that Plaintiffs had "accepted the payments without reservation or protest." (Maloney Aff. ¶ 5.) Additionally, Defendant's counsel represented that TSG had been paying Dannhauser $33,333.33 each month toward the purchase price for Dannhauser's equity interest (*id.* ¶ 8), even though the total amount due would not be ascertained until the finalization of the appraisal. By Defendant's calculations, those payments then totaled $433,333.29. (*Id.*)

Moreover, in connection with Defendant's January 18, 2019, reply submissions on its motion, TSG's CEO, Michael Rixon, stated the following:

> Since the Settlement was executed, TSG made all of its Settlement payments to Dannhauser. To date, TSG has paid Dannhauser a total of $466,666.62 toward the Purchase Price for his equity. Since June 5, 2018 – the date Dannhauser claims that TSG violated the Settlement by supplying Dannhauser with allegedly deficient Ledger Information – TSG has paid and Dannhauser has accepted $233,333.31 without reservation, including the payment TSG made in January 2019, *after* TSG filed its Motion.

(Rixon Aff. ¶ 43 (emphasis in original).)

10

Thus, as a general matter, Defendant states that Dannhauser has accepted all commission-
and equity-related payments to date, without reservation or objection. (*Id.*; *see also* Maloney
Aff. ¶¶ 5, 8, 13.) Plaintiffs do not dispute this assertion in their own submissions to the Court.

## D.    The Parties' Positions on the Pending Motions

In their motion papers, each side claims that the other has breached the Settlement
Agreement. Defendant, which filed the first of the parties' competing motions, contends that
Dannhauser has breached his obligation to pay Empire one-half of its fees, effectively blocking
the release of its final appraisal. Defendant seeks an order from the Court directing Dannhauser
to pay Empire what is owed, and to cease and desist from otherwise obstructing a final resolution
of this case.[3] (Def. Mem., at 1.)

Plaintiffs, for their part, do not dispute that Dannhauser has failed to pay Empire, nor do
they make a serious attempt to counter Defendant's argument that this failure constitutes a
breach of the Settlement Agreement. (*See* Pl. Mem., at 13.) Rather, Plaintiffs appear to take the
position that, by providing Empire with a so-called "general ledger" that lacked the type of
transactional information that, according to Plaintiffs, one would expect a general ledger to
contain, and by providing Dannhauser with insufficient information and copies of materials that,
in his view, were overly redacted, Defendant itself breached the parties' agreement, thereby
excusing Dannhauser's failure of payment. (*See id.* (arguing that "it is TSG who fail[ed] to
comply with the Settlement Agreement [and that] TSG must comply with its obligations before
the appraisal report can be finalized").)

---

[3] Defendant also asks the Court to order "[P]laintiffs to meet their discovery destruction
obligations" (Def. Mem., at 1), but Defendant's reply brief indicates this request is now moot
(*see* Def. Reply Mem., at 4), and thus this Court will not address it here.

Plaintiffs ask the Court to order Defendant to produce to Empire a more detailed general

ledger (which Plaintiffs characterize as "an actual company General Ledger" (*id.*, at 3)),

"including all individual transactions from American Express statements and an appropriate

coding to identify expenses relative to the various categories of TSG's Cost of Operations"

(*id.*, at 12). Plaintiffs also ask for an order compelling Defendant to provide Dannhauser with

"unredacted expenses other than the very few specifically identifiable items that could

objectively constitute sensitive business information" and "documents and information

supporting and underlying computer system development and maintenance expenditures."[4] (*Id.*)

While Plaintiffs do not explicitly ask that Empire be required to revisit the work that it has

already performed in connection with the appraisal, they contend that Defendant's purported

breaches "[have] ma[de] an independent investigation of TSG's fair market value impossible"

(*see id.*, at 11), and that the draft appraisal "cannot be accurate" (*id.*). Plaintiffs thereby

implicitly suggest that, if the Court were to compel Defendant to provide additional information

to Empire (and to Dannhauser), then Empire should be required to reconsider its preliminary

conclusions, in light of that additional information.

---

[4] It is unclear whether this last category of information (regarding "computer system development and maintenance expenditures") is encompassed by Plaintiffs' request for an unredacted copy of "an actual company General Ledger" or is, instead, intended by Plaintiffs to constitute a separate category of information that they believe TSG was required to provide. In his Affidavit, Dannhauser identifies a "$60,000 recurring monthly fee" for software development and specifically complains about "a lack of transparency as to the party to whom these consulting fees [were] paid, and what TSG has received in return." (Dannhauser Aff. ¶ 26.) Thus, with respect to these fees, Dannhauser is apparently complaining not only that vendor names were redacted from what he was provided, but also that Defendant should have provided him with substantive information regarding the nature of the services provided by those vendors. Plaintiffs, however, have not pointed to any provision in the Settlement Agreement that obligated Defendant to produce such information.

## DISCUSSION

## I.   THE COURT'S AUTHORITY TO ENFORCE
THE TERMS OF THE SETTLEMENT AGREEMENT

### A.   The Court's Express Retention of Jurisdiction

"Enforcement of [a] settlement agreement . . . whether through award of damages or

decree of specific performance . . . requires its own basis for jurisdiction." *Kokkonen v.*

*Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994). A "motion to enforce a settlement

agreement is fundamentally a claim for breach of a contract." *Hendrickson v. United States*, 791

F.3d 354, 358 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Kokkonen*, 511 U.S. at

381). Breach of contract claims are typically a matter for state courts, unless the district court

retains ancillary jurisdiction over the settlement agreement.[5] *Kokkonen*, 511 U.S. at 382.

To retain jurisdiction, "*Kokkonen* prescribes that a district court's order of dismissal must

either (1) expressly retain jurisdiction over the settlement agreement, or (2) incorporate the terms

of the settlement agreement in the order." *Hendrickson*, 791 F.3d at 358. A district court can

expressly retain jurisdiction by, for example, "so-ordering" a stipulation of dismissal that

contains a provision stating: "This Court shall retain jurisdiction over the settlement agreement

for enforcement purposes." *Roberson v. Giuliani*, 346 F.3d 75, 78 (2d Cir. 2003) (internal

quotation marks omitted). If ancillary jurisdiction is so retained, "a breach of the agreement

would be a violation of the order." *Kokkonen*, 511 U.S. at 381. Thus, ancillary jurisdiction

confers "the authority to force compliance with the terms agreed upon by the parties," *Roberson*,

346 F.3d at 83, whether that entails decreeing specific performance, entering a monetary

---

[5] Additionally, a court may enforce a settlement agreement if the parties allege diversity
of citizenship or if their contract dispute is governed by federal law, *Melchor v. Eisen & Son
Inc.*, No. 15cv00113 (DF), 2016 WL 3443649, at *8 (S.D.N.Y. June 10, 2016), but neither of
these bases for jurisdiction is present here.

judgment, or fashioning other appropriate relief. *See id.*; *Kokkonen*, 511 U.S. at 378; *see also Peacock v. Thomas*, 516 U.S. 349, 356-57 (1996) (listing various other remedies ancillary jurisdiction empowers federal courts to fashion); *Kaplan v. Reed Smith LLP*, 919 F.3d 154, 157 (2d Cir. 2019) (noting that ancillary jurisdiction allows district courts to resolve requests for attorneys' fees).

In this case, the Court expressly retained jurisdiction. The Stipulation of Voluntary Dismissal with Prejudice, so-ordered by the Court on December 20, 2017, states: "The Court hereby retains jurisdiction for the purposes of enforcing the parties' confidential Settlement Agreement and General Release." (Dkt. 93.) This Stipulation operated as an order of dismissal, and it is, by its terms, sufficient to demonstrate the Court's retention of ancillary jurisdiction to enforce the parties' agreement and order appropriate relief. *See Roberson*, 346 F.3d at 82 ("[D]espite the district court's statements that it had not specifically reviewed or approved the terms of the settlement agreement, the district court retained jurisdiction to enforce the Agreement. . . . [such that] it necessarily made compliance with the terms of the agreement a part of its order . . . ." (citation omitted)).

**B.    Limitation of Magistrate Judge Authority Under 28 U.S.C. § 636(b)**

Pursuant to 28 U.S.C. § 636(b), district judges may designate magistrate judges to determine many types of matters, but certain disputes, including those that would be dispositive of a party's claims or defenses, may not be decided by a magistrate judge, absent consent of the parties. *See* 28 U.S.C. § 636(c). Although the governing statute does not specifically list a "motion to enforce a settlement" as a type of motion that may not be decided by a magistrate judge without the parties' consent, *see* 28 U.S.C. § 636(b)(1)(A), the weight of authority in this Circuit is that such a motion should be characterized as either "dispositive," *see, e.g.,*

14

*Goldstein v. Solucorp Indus., Ltd.*, No. 11cv6227 (VB), 2017 WL 1067792, at \*1 (S.D.N.Y. Mar. 21, 2017); *Waite v. Schoenbach*, No. 10cv3439 (RMB) (JLC), 2011 WL 3425547, at \*1 n.1 (S.D.N.Y. Aug. 5, 2011), *report and recommendation adopted by* 2011 WL 6326115 (Dec. 16, 2011), or the "functional equivalent" of a dispositive motion, *see, e.g., Edwards v. City of New York*, No. 08–CV–2199 (FB) (JO), 2009 WL 2865823, at \*2-3 (E.D.N.Y. May 22, 2009) (citing *Williams v. Beemiller, Inc.*, 527 F.3d 259, 266 (2d Cir. 2008)), *report and recommendation adopted by* 2009 WL 2601311 (Aug. 21, 2009). Based on this precedent, this Court will detail its findings in this Report and Recommendation.

## II. DANNHAUSER'S UNDISPUTED BREACH OF THE SETTLEMENT AGREEMENT IS NOT EXCUSED BY DEFENDANT'S PURPORTED BREACH.

As noted above, Plaintiffs do not dispute that Dannhauser is obligated under the Settlement Agreement to pay one-half of Empire's fees for the appraisal, or that Dannhauser has refused to make that payment. (*See* Pl. Mem., at 13; *see also* Settlement Agreement ¶ 4.1.3.) Nor do Plaintiffs dispute that the parties' agreement to use an independent appraiser to determine the value of Dannhauser's equity interest in TSG – and their agreement to share the cost of the appraisal – are material terms of the Settlement Agreement, such that a refusal to pay would constitute a material breach. Instead, Plaintiffs' position apparently rests on the argument that, by supposedly providing insufficient information to both Empire and Dannhauser, *Defendant* materially breached the agreement, undermining Empire's ability to conduct a fair and accurate appraisal, and thereby relieving Dannhauser of the obligation to pay for that appraisal. (*See* Pl. Mem., at 2-3, 11); *see also, e.g., Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 137 (2d Cir. 2016) ("[A] party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain . . . ."). This Court has considered

15

Plaintiffs' argument, but finds it unpersuasive, both because Dannhauser has apparently continued to accept the benefits of the parties' agreement, and also because Plaintiffs have not met their burden of demonstrating that Defendant actually breached the agreement.

## A. Dannhauser May Not Refuse To Perform His Contractual Obligations and Still Accept the Benefits of the Parties' Agreement.

A "motion to enforce a settlement agreement is fundamentally a claim for breach of a contract." *Hendrickson*, 791 F.3d at 358. Therefore, basic contract principles apply to determine the rights and obligations of the parties. Under New York law,[6] it is well established that "[u]nder no circumstances may [a] non-breaching party stop performance and continue to take advantage of the contract's benefits." *Martha Graham School & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 43 F. App'x 408, 415 (2d Cir. 2002) (summary order) (quoting *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 386 (S.D.N.Y. 2000) (emphasis omitted))).

Dannhauser does not dispute that he has continued to receive and accept settlement payments from TSG throughout the appraisal process, including after he claimed that Defendant had breached the Settlement Agreement by purportedly providing an inadequate general ledger to Empire and excessively redacting documents given to him, and even after Defendant filed its motion to enforce the Settlement Agreement. (*See* Maloney Aff. ¶¶ 5, 8, 13; Rixon Aff. ¶ 43

---

[6] The Second Circuit has not determined whether state or federal law should apply to the interpretation of federal settlements, where the settlement agreement is silent on the matter (as it is here). *See United States v. Prevezon Holdings, Ltd.*, 289 F. Supp. 3d 446, 450 (S.D.N.Y. 2018). Nonetheless, "a number of district court cases examining this question have concluded that such disputes are quintessentially of contractual interpretation and wholly governed by state law." *Id.* Further, based on the parties' reliance in their briefs on the law of New York, in particular (*see* Def. Mem., at 8; Pl. Mem. at 14), this Court understands that they agree that New York law governs this case, which is "sufficient to establish the applicable choice of law," *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).

16

(stating that TSG had made a payment to Dannhauser in January 2019, after Defendant's motion

was filed, and that Dannhauser had continued to accept all settlement payments without

reservation); *see generally* Dannhauser Aff. (not refuting the point).) Thus, even if Defendant

had materially breached the Agreement, Dannhauser relinquished his right to stop performance

by continuing to accept the benefits of the contract after the breach allegedly occurred. For this

reason alone, Dannhauser's contractual obligation to pay the appraiser cannot be considered

legally excused. Accordingly, Defendant is entitled to an order compelling Dannhauser to make

the required payment to Empire, so that its final appraisal can be issued and the Settlement

Agreement fully performed.

## B.    Plaintiffs Have Not Established That Defendant Materially Breached the Settlement Agreement.

Even apart from the fact that Dannhauser has not denied that he continued to accept

contract benefits after Defendant's supposed breach, Plaintiffs have not met their burden of

establishing that Defendant did, in fact, materially breach a term of the Settlement Agreement, so

as to excuse Dannhauser's performance thereafter. *Raymond v. Marks*, 116 F.3d 466, 1997 WL

345984, at *1 (2d Cir. Jun. 24, 1997) (unpublished opinion) ("Under New York law, the party

asserting a breach of contract claim has the burden of proving the material allegations . . . by a

fair preponderance of the evidence.").

### 1.    Plaintiffs Have Not Shown That Defendant Failed To Provide Empire With the "Ledger Information" Called for by the Contract.

The terms of a settlement agreement are construed according to general principles of

contract law, *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir.

1999), and, again, this Court will apply New York law to construe the terms of the Settlement

Agreement (*see supra*, at n.7). Under New York law, when a term is expressly defined in a

17

contract, the agreed-to definition generally supersedes any other meaning of the term. *See New York Overnight Partners v Gordon*, 217 A.D.2d 20, 27 (1st Dep't 1995) (noting that the New York Court of Appeals has adopted the rule that parties to a contract "may expressly attach a certain meaning to a term which, then, overrides the technical, common-law meaning of the word" (citing *Rosenfeld v. Aaron*, 248 N.Y. 437 (1928))); *Mionis v Bank Julius Baer & Co.*, 301 A.D.2d 104, 109 (1st Dep't 2002) ("[T]he court violated a fundamental principle of contract interpretation by failing to give effect to a defined term in the authorization agreement . . . ."). Courts therefore look to the definition of a term provided in the contract before considering how a dictionary defines the term. *See, e.g., Powers v. Stanley Black & Decker, Inc.*, 137 F.Supp.3d 358, 375 (S.D.N.Y. 2015); *In re LightSquared Inc.*, 504 B.R. 321, 346 (Bankr. S.D.N.Y. 2013).

Plaintiffs principally argue that Defendant violated the terms of the Settlement Agreement that required it to provide to Empire "TSG's general ledger in native format with respect to the 'Cost of operations' and 'Selling, general, and administrative expenses' as reported in TSG's Financial Statements for the years ended December 31, 2014, 2015, and 2016 (the 'Ledger Information')." (Settlement Agreement ¶ 4.1.1.) On this subject, Plaintiffs focus exclusively on the supposed meaning of the term "general ledger," arguing that the term is unambiguous as a matter of law, that it should be interpreted according to its "ordinary usage," and that the information that Defendant provided to Empire fell short of a "general ledger," as that term has been defined in various dictionaries. (*See* Pl. Mem., at 15-17.) In particular, Plaintiffs contend that the material that TSG provided to Empire did not qualify as a "general ledger" as that term is ordinarily defined because it consisted of "an [E]xcel spreadsheet containing aggregate amounts of expenses and accounts, without detailing any specific transactions." (*Id.*, at 2.)

18

As Defendant aptly points out, however, paragraph 4.1.1 of the Settlement Agreement did not require Defendant to provide a "general ledger" to Empire, as the term might be defined by lexicographers. (*See* Def. Reply Mem., at 14.) Rather, that provision of the contract required TSG to provide "Ledger Information," a term defined in the agreement as being based on a specific, existing document or set of materials: *TSG's* general ledger. (*See* Settlement Agreement ¶ 4.1.1.) Moreover, the contractually defined "Ledger Information" did not include TSG's entire general ledger, but rather only portions of that ledger – *i.e.*, the portions of the ledger that concerned "the 'Cost of operations' and 'Selling, general, and administrative expenses' as reported in [certain identified financial statements]." (*Id.*) In its reply submissions, Defendant has explained that the Ledger Information it provided was taken directly from its general ledger, as that ledger was maintained by it in the ordinary course of its business. (*See* Rixon Aff. ¶¶ 3-10.) In other words, Defendant denies that its general ledger contained the more detailed information that Plaintiffs argue it should have contained; rather, Defendant asserts that it produced the identified portions of the actual general ledger it maintained, in the way in which TSG maintained it. (*See id.*) On this last point, Defendants further explain that, by producing data on an Excel spreadsheet, it produced the required Ledger Information in the format in which its general ledger was created and maintained, thereby satisfying its contractual obligation to produce that information in "native format." (*See id.* ¶ 3; *see also* Settlement Agreement ¶ 4.1.1.)

Indeed, Plaintiffs' argument that, "[a]lthough TSG stated that the Excel Spreadsheet is the only form in which it can produce its financial information, that does not excuse TSG from complying with the terms of the heavily negotiated Settlement Agreement" (Pl. Mem., at 16) is a non-sequitur, given that the Settlement Agreement required Defendant to produce the Ledger

19

Information in native format. Further, Defendant notes that, prior to entering into the Settlement Agreement, Dannhauser was made fully aware of how its general ledger was maintained and of the types of information it included. (Def. Reply Mem., at 6-7.) Despite their seeming frustration with the level of detail in the materials Dannhauser received, Plaintiffs do not seriously contend that Defendant failed to provide to Empire and Dannhauser, in timely fashion, the specified "Ledger Information," *i.e.*, the identified portions of what Defendant considered to be its general ledger, in the native (Excel) format in which it was created and maintained.

Moreover, to the extent any dictionary definitions of "general ledger" might be relevant here, Plaintiffs have not demonstrated that the materials from which Defendant pulled the necessary "Ledger Information" would fall outside such definitions. In this regard, Plaintiffs assert that, by common understanding, a general ledger is supposed to include detailed transactional information regarding, *inter alia*, each and every one of the company's expenses. (*See* Pl. Mem., at 2, 7-10, 15-17.) Yet, in support of this proposition, Plaintiffs quote from an online "business dictionary" (found at www.businessdictionary.com) that indicates, to the contrary, that a general ledger is a repository of accounting information that records "*summaries* of all financial transactions (culled from subsidiary ledgers)." (*See id.*, at 16 & n.72 (emphasis added).) Plaintiffs have not demonstrated that the "business dictionary" they have cited is a reliable source, but, even assuming it is, they have not shown that TSG's general ledger was anything other than this type of repository of summarized information. (*See* Rixon Aff. ¶ 3 (explaining that the data contained in TSG's general ledger "has always been manually entered

20

[into the Excel spreadsheets] based upon underlying source materials, such as invoice payment details, credit card statements, expense reimbursements, and commission payment details").)[7]

## 2. Plaintiffs' Argument Regarding the Adequacy of the Information Provided by Defendant to Empire Also Ignores the Broader Context of the Appraisal Provisions of the Contract.

Not only have Plaintiffs failed to show that the information provided by Defendant to Empire was less than what was required by the Settlement Agreement, but, in focusing on a single contract term, they have obscured the context of the parties' broader agreement that was plainly designed to place control over the appraisal process in the hands of the appraiser. Under New York law, individual contractual provisions "should be given meaning in the context of the instrument as a whole, including . . . the circumstances under which the contract was executed." *Horowitz v. Am. Int'l Grp., Inc.*, 498 F. App'x 51, 53 (2d Cir. 2012) (emphasis and citation omitted); *see also JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) ("In interpreting an unambiguous contract, the court is to consider its '[p]articular words' not in isolation 'but in light of the obligation as a whole and the intention of the parties as manifested thereby. . . .'" (citation omitted)).

_____

[7] In their moving brief, Plaintiffs also quote the Merriam Webster dictionary definition of a "general ledger," as "the principal and controlling ledger of a business enterprise containing individual or controlling accounts for all assets, liabilities, net worth items, revenue, and expenses." (Pl. Mem., at 16 n.73.) Again, nothing in the cited definition indicates that a general ledger, as opposed to any subsidiary ledger, must itself contain granular transactional information regarding every individual expense item. This Court also notes that Plaintiffs offer yet a third definition of "general ledger" in their reply brief, taken not from a dictionary, but rather from the Corporate Finance Institute website. (*See* Pl. Reply Mem., at 5 & n.18.) Even aside from the fact that the Court need not consider matters raised for the first time on reply, *see In re Grand Jury Subpoenas Returnable December 16, 2015*, 871 F.3d 141, 147 (2d Cir. 2017), that website explains what a "general ledger" is in accounting terms (*see* https://corporatefinanceinstitute.com/resources/knowledge/accounting/general-ledger-gl/), and further explains, through the use of a chart, that "general ledger accounts" may be generated from underlying "subledgers" (*see id.*).

21

Paragraph 4.1 of the Settlement Agreement provides for the engagement of an independent appraiser and describes the appraisal process. The intent behind this section of the Agreement is evident: because of the considerable bad will between Dannhauser and TSG, the parties wanted an outside, unaffiliated, and unbiased party to make judgments and calculations that they did not trust each other to make. Indeed, Plaintiffs concede that Dannhauser agreed to engage Empire "in an effort to make progress on the settlement" after "TSG failed [in Dannhauser's view] to provide a fair market value assessment of Dannhauser's stock" on its own. (Pl. Mem., at 5.) Empire was therefore entrusted to manage the appraisal process, unencumbered by the parties' individual assessments or interpretations. The parties' only role in the appraisal process consisted of answering questions and making suggestions, but "as an independent appraiser[,] Empire [was] free to consider such suggestions and responses *as it s[aw] fit*." (Settlement Agreement ¶ 4.1.1 (emphasis added); *see also* Rixon Aff. ¶ 22 (noting the parties' intentionally limited role).) In other words, the parties agreed that Empire, in the exercise of its independent judgment, would have the unfettered discretion to act upon – or to disregard – their suggestions.

Within his limited role under the contract, Dannhauser had numerous opportunities to try to convince Empire that it needed to request more transaction-specific ledger information from TSG. The Settlement Agreement expressly provided for one such opportunity by which the parties could voice their input – a meeting with Empire. (Settlement Agreement ¶ 4.1.1.) This meeting was held on June 12, 2018 (Dannhauser Aff. ¶ 18; Maloney Aff. ¶ 12), and Dannhauser states that he raised his concerns about TSG's general ledger with Empire at that time (Dannhauser Aff. ¶ 20). Specifically, Dannhauser states that he told Empire that "the general ledger [was] incomplete and consist[ed] of nothing more than an [E]xcel spreadsheet itemizing

expenses from TSG's checking account." (*Id.*) In response to this and other comments, Empire

requested additional information from TSG and apparently invited Dannhauser to alert the

appraiser to any "open items" that Empire had not addressed in the request. (Rixon Aff. ¶ 30.)

Additionally, although not expressly required to do so by the Settlement Agreement, Empire

gave both parties the opportunity to submit comments on its draft appraisal, issued on August 22,

2018. (Maloney Aff., Ex. 6, at 3.) Empire also contemplated that, after submitting their written

comments, the parties would schedule a call with the appraiser to discuss those comments

further. (*See id.*; *see also id.*, Ex. 7, at 5.) Dannhauser therefore had at least four opportunities to

suggest to Empire that more information was needed from TSG. After Dannhauser made (or

failed to make)[8] his suggestions, Empire was entitled, under the Settlement Agreement, to deal

with the issues "as it s[aw] fit." (Settlement Agreement ¶ 4.1.1.) If Empire agreed with

Dannhauser, it was empowered to request additional information or documentation from TSG,

and TSG would have been obligated to provide it. (*Id.*)

Evidently, Dannhauser was not satisfied with how Empire dealt with his suggestions,

because he now asks the Court to order Defendant to produce to Empire the same information

that he had wanted Empire to obtain from Defendant during the appraisal process. With respect

to the "Ledger Information" that he particularly places at issue, Dannhauser argues here that the

"general ledger" that Defendant provided to Empire was inadequate, as a matter of law, because

it was "[an] Excel Spreadsheet that [was] manually prepared," and which "simply list[ed] a total

sum of expenses, on a monthly basis, . . . without providing any further detail." (Pl. Mem., at 8.)

As can be seen from the statements quoted above from Dannhauser's Affidavit, this is virtually

---

[8] Although Plaintiffs now argue that TSG's general ledger is inconsistent with its
financial statements (*see* Dannhauser Aff. ¶ 24), it does not appear that Dannhauser ever raised
this particular issue with Empire (*see id.* ¶¶ 19-21).

identical to the comments he claims to have made during the June 12 meeting with Empire. Where Dannhauser, as a condition of settlement, specifically bargained for the appraiser's independence, and where the very purpose of that bargain was to give Empire the sole discretion to make the appraisal determination, Danhauser is not now entitled to set that determination aside because Empire failed to see the value of his suggestions.

Furthermore, despite Dannhauser's contention, there is no evidence that Empire – which Dannhauser presumably agreed was qualified to render an opinion as to the value of his equity interest – "was unable to adequately verify and analyze [TSG's general ledger], thereby making an independent investigation of TSG's fair market value impossible." (*Id.*, at 11.) In his Affidavit, Dannhauser claims that the appraiser "agreed . . . that TSG's information [was], in part, lacking" (Dannhauser Aff. ¶ 25), but there is no independent corroboration of this, and Empire issued its draft appraisal without expressing any reservations regarding the soundness of its findings (*see* Maloney Aff., Ex. 6). Dannhauser also argues that, "without an accurate[,] detailed picture of TSG's expenses, [he] has been unable to review, evaluate, and comment on the reasonableness of TSG's disbursements and their attendant impact on the Company's valuation." (Pl. Mem., at 8.) Once again, though, Dannhauser bargained for an independent appraiser, and it was thus Empire, not Dannhauser, that was tasked with reviewing and evaluating the reasonableness of TSG's disbursements.

Finally, this Court notes that the Settlement Agreement contains no provision allowing for objections to Empire's appraisal, including its draft appraisal. The Settlement Agreement expressly states that Empire's fair-value determinations were to be "final and binding on the Parties with no right of challenge or appeal." (Settlement Agreement ¶ 4.1.) Plaintiffs attempt to sidestep this provision by arguing that "Dannhauser's cross-motion is a proper challenge because

Empire has not made its final determinations." (Pl. Reply Mem., at 2.) Even overlooking the

fact that the only reason Empire has not issued a final report is that Dannhauser has refused to

pay, this argument has no merit. The provision prohibiting challenges to the appraisal makes no

mention of "final determinations"; it states only that the parties may not challenge or appeal the

appraiser's "determinations . . . of fair market value" (Settlement Agreement ¶ 4.1), which would

encompass the draft appraisal. There is thus nothing in the Settlement Agreement suggesting

that either party would have the right to challenge Empire's determinations at any time.

For all of these reasons, this Court finds that Plaintiffs have not met their burden of

establishing that Defendant breached the provision of the Settlement Agreement that required it

to provide "Ledger Information" to Empire. First, Plaintiffs have not shown that the information

provided by Defendant to Empire did not, in fact, constitute the "Ledger Information" defined in

the contract. Second, when the contract terms at issue are viewed in context, it is apparent that,

to the extent Dannhauser had any concerns regarding the adequacy of the produced Ledger

Information, he had the right to raise those concerns with Empire, and it was *Empire*, in its sole

discretion, that would then decide whether additional information was necessary to render an

informed and accurate appraisal.

### 3. Plaintiffs Have Also Not Shown That Defendant Breached the Settlement Agreement by Excessively Redacting the Materials It Provided to Dannhauser.

Plaintiffs also contend that TSG improperly redacted information that Dannhauser was

entitled to see under the Settlement Agreement. (Pl. Mem., at 17). On this issue, Plaintiffs claim

that Defendant "applied virtually blanket redactions concerning payments from the corporate

checking account" for expenses such as travel, office supplies, restaurants, and consulting

services, among others, "[n]one of [which] implicate[d] TSG's current court-reporting business."

25

(*Id.*, at 18.) According to Plaintiffs, this supposed "egregious usage of redactions on the Excel Spreadsheet and other financial documents expressly contradict[ed] the plain language of the Settlement Agreement" (*id.*, at 17), "prevent[ed] Dannhauser from assessing or evaluating irregularities that have been observed[,] and in turn, [] prevented [him] from disclosing such information to Empire" (*id.* at 18). Defendant counters that, in the Ledger Information it provided to Dannhauser, it redacted identifying information pertaining to TSG's customers, employees, court reporters, and vendors, as it was entitled to do under the contract (*see* Maloney Aff. ¶ 11 n.1; *see also* Rixon Aff., Ex. 21), but it did not redact the type of expense or the dollar amount for any stated item (Rixon Aff., Ex. 21).

As to which redactions were allegedly improper, Dannhauser specifically cites "[e]xpenses for travel, office supplies, restaurants, consulting services, internet service providers and other such services." (Pl. Mem., at 18.) Most of these expenses would likely qualify as disbursements to vendors, as opposed to customers, employees, or court reporters. In fact, Dannhauser seems focused on vendors in his Affidavit, asserting that, "[w]ithout being able to identify the vendors that TSG [was] paying money to, [he was] unable to properly assess whether certain expenses [were] self-dealing and need[ed] to be considered, and/or added back for the purpose of the valuation." (Dannhauser Aff. ¶ 22.) He further asserts that, because of this "potential effort to mask the identity of . . . vendors . . . .[,] there [was] no way to determine whether expenditures for any line item were reasonable, arm's-length, and not self-dealing." (*Id.* ¶ 21.)

Plaintiffs' argument as to Defendant's redactions is unpersuasive for substantially the same reasons their argument with respect to the general ledger is unpersuasive. As an initial matter, the Settlement Agreement permitted Defendant to redact "competitively sensitive and

proprietary information from the copies of the materials it provide[d] to Dannhauser, without redacting the data relevant to the valuation" (Settlement Agreement ¶ 4.1.1 n.3), and Plaintiffs have not demonstrated that Defendant's redactions fell outside those permissible bounds. Further, the agreement required Defendant to provide Empire with unredacted copies of its Ledger Information and other appraisal materials – only Dannhauser was to receive the redacted versions. *(See id.* ¶ 4.1.1.) Therefore, when Dannhauser asserts that there was "no way to determine" whether expenses were reasonable and legitimate, he more accurately means there was no way for *him* to determine that.

Yet, as explained in greater detail above, Dannhauser was not charged with determining whether expenditures were reasonable, arm's-length, or self-dealing, or whether they should be "added back for the purpose of the valuation." Dannhauser bargained away that authority, instead opting for an independent appraiser to make such determinations. Under the Settlement Agreement, Dannhauser's only role in the appraisal process was to respond to Empire's questions and to make suggestions. Dannhauser had numerous opportunities to suggest to Empire, for example, that TSG was potentially paying family members to perform certain services, but that he could not be certain of this because the identities of the payees were redacted on his copies of TSG's documents. *(See* Dannhauser Aff. ¶ 21.) In fact, Dannhauser states that he raised these very concerns during the June 12 meeting with Empire, and that Empire's representative told him that he would "look at the unredacted expenses to determine if anything seem[ed] improper." *(Id.* ¶ 26.) Dannhauser was not uniquely positioned to advise Empire on this point, as Empire was empowered to request additional information from TSG if it needed to know, for instance, which vendors were affiliated with family members. (Settlement Agreement ¶ 4.1.1.)

Thus, once again, it appears that Dannhauser is unhappy that Empire did not do more in response to his suggestions, and that he is now asking the Court to allow him to investigate more thoroughly what Empire did not. The purpose of the appraisal provisions of the Settlement Agreement, however, was to take that type of investigation out of the hands of the parties and place it within Empire's discretion. Accordingly, because Dannhauser has not demonstrated that Defendant's redaction of identifying information was actually contrary to the terms of the Settlement Agreement, or that it prevented Dannhauser from doing anything he was entitled to do under the agreement, this Court finds that the redactions do not constitute a breach of contract.

## III.    DEFENDANT IS NOT ENTITLED TO ATTORNEYS' FEES.

Lastly, although this Court finds that Defendant's substantive position on the pending motions has merit and Plaintiffs' does not, this does not mean that Defendant is necessarily entitled to recover the attorneys' fees that it incurred in connection with the motion practice, and, upon reviewing the applicable legal standard and the record before it, this Court recommends that no attorneys' fees be awarded.

The Settlement Agreement is silent on the issue of attorneys' fees. (*See generally* Settlement Agreement.) Defendant therefore asks the Court to exercise its inherent power to award attorneys' fees, based on an assertion that Plaintiffs have acted "[in] bad faith, vexatiously, wantonly, or for oppressive reasons." (Def. Mem., at 10 (internal quotation marks and citation omitted)); *Castillo Grand, LLC v. Sheraton Operating Corp.*, 719 F.3d 120, 124 (2d Cir. 2013) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 258-59 (1975)). This Court is conscious that the optics of Dannhauser's conduct during the appraisal process – accepting settlement payments while refusing to pay his share of Empire's fees – are

28

unfavorable to Plaintiffs. Dannhauser's actions, however, do not meet the high threshold for an exercise of the Court's inherent power to award attorneys' fees. Fundamentally, while this Court disagrees with Plaintiffs' argument that Defendant should be held in breach of the Settlement Agreement for its failure to provide more transaction-specific ledger information, this Court has no basis to conclude that Plaintiffs' argument in this regard – which appears to have been primarily motivated by a desire to ensure that Empire had information that Dannhauser considered necessary to the appraisal – was advanced in bad faith.

Defendant also notes that this is the second time it has filed a motion to enforce a settlement in this case, supposedly evidencing a "repeated course of dilatory and improper conduct in this litigation" by Plaintiffs. (Def. Mem., at 10.) This Court has made no finding, however, that the parties' initially reported resolution in principle was an enforceable agreement that was breached by Plaintiffs. Moreover, renegotiating a settlement agreement does not, in itself, suggest bad faith.

Accordingly, although Dannhauser's conduct has not been exemplary and this Court has found Plaintiffs to be in breach of the Settlement Agreement, this Court finds that the demanding standard for an exercise of the Court's inherent power to award attorneys' fees has not been not met.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that Defendant's motion to enforce the Settlement Agreement (Dkt. 97) be granted, to the extent that Dannhauser be directed to pay his share of Empire's fees forthwith, so that a final appraisal may be issued, and the performance of the Settlement Agreement may be completed. I further recommend, however, that Defendant's motion be denied, to the extent that Defendant seeks an award of attorneys'

Case 1:16-cv-00747-CM-DCF Document 109 Filed 06/21/19 Page 30 of 30

fees. I also recommend that Plaintiffs' cross-motion to enforce the Settlement Agreement
(Dkt. 101) be denied in all respects.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil
Procedure, the parties shall have fourteen (14) days from service of this Report to file written
objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be
filed with the Clerk of Court, with courtesy copies delivered to the chambers of the
Honorable Colleen McMahon, and to the chambers of the undersigned, United States
Courthouse, 500 Pearl Street, Room 1660, New York, New York, 10007. Any requests for an
extension of time for filing objections must be directed to Judge McMahon. FAILURE TO FILE
OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF
OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S.
140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993);
*Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58
(2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
June 21, 2019

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All counsel (via ECF)

30